SANFORD L. STURTEVANT ET AL., PLAINTIFFS IN ERROR, v. THE STATE OF NEBRASKA, EX REL. ANSON L. HAVENS, DEFENDANT IN ERROR.

1. **Infant:** CUSTODY OF. Where an infant child, eight months of age, is in the custody of its grandparents, its mother being dead, and it appearing that it would be more for the benefit of the infant to remain with them than to be put under the care of the father, the court will refuse to direct the infant to be delivered to him.

2. **Interest of Child only to be Considered.** In such a controversy for the custody of the child the order of the court should be made with a single reference to the best interests of such child.

ERROR to the district court for Merrick county. Tried below before POST, J.

*W. H. Munger, James G. Reeder*, and *George D. Meiklejohn*, for plaintiffs in error.

*Harwood, Ames & Kelly* and *Ewing & Reinoehl*, for defendant in error.

REESE, J.

This cause originated in the district court of Merrick county, where the defendant in error sued out a writ of *habeas corpus* for the purpose of procuring the custody of Ella Nettie Havens, his infant child, who was in the custody of the plaintiffs in error. A trial was had, and the court having stated its findings of fact and conclusions of law, and entered judgment against the plaintiffs in error, the case is brought into this court for review.

The findings of fact are as follows:

"1. The said Ella Nettie Havens, the child named in said writ, is the infant daughter of the relator and the grandchild of the respondents; that said child was born in Central City, Merrick county, Nebraska, on the twenty-sixth day of December, 1882, and is now eight months of age, and that the mother of said child, who was the wife of the relator and the daughter of the respondents, died on the sixth day of January, 1883, her death being caused by blood poisoning occasioned by the birth of said child.

"2. The relator is a man in every way well qualified and able to have and exercise the care and custody of said child; that he is possessed of ample means to raise, educate, and provide for her, and has procured a nurse to assist in the care and education of said child who is in every way well qualified and fitted for said trust.

"3. The respondents are also proper persons to have the care and education of said child; they have a suitable

home and are qualified and possessed of ample means and well fitted to nurse, educate, and care for her, and are desirous of raising and educating said child out of their own means, and are now greatly attached to her.

"4. During the last sickness of the relator's wife, and a few days before her death, and when said deceased as well as the relator and respondents expected her death soon to occur, the said wife asked the respondent S. L. Sturtevant to take said child and raise and care for it in all respects as his own; that said respondent agreed so to do, and answered said request in the affirmative; that the relator was present at said conversation and did not assent to or dissent from said proposition, but remained silent.

"5. The day following the funeral of the relator's wife respondents took said child, in good faith, with the knowledge and consent of the relator, from Central City to their home in Nance county, the relator at said time not being prepared to nurse or care for said child in his own house.

"6. That in taking said child to their home respondents claim to have acted upon the said request of the relator's wife.

"7. That said relator visited said child at the home of the respondents three different times between the eighth day of January, 1883, and the fifteenth day of April, 1883, but did not demand said child from respondents at any of said times.

"8. That about the fifteenth day of April, 1883, being in poor health and distressed in mind on account of the death of his wife, with the knowledge and by the advice of respondents said relator went east on a visit and did not return until June 18th, 1883, and a few days thereafter, to-wit, on the nineteenth day of June, 1883, he demanded said child from the respondents, who refused and have ever since refused to deliver her to the relator, but on the contrary have, ever since said date, detained said child contrary to the wish and demand of the relator.

"9.    That the value of the respondents' services and money expended in caring for said child since January 8, 1883, is $10 per week.

"10.    That said relator is twenty-three years old and has no other children and no one depending upon him, and the respondents are both about forty-two years of age and have two daughters now living."

Conclusions of law :

"1.    Said child, Ella Nettie Havens, is wrongfully and unlawfully restrained of her liberty by the respondents, S. L. Sturtevant and Hannah Sturtevant.

"2..    The relator, Anson L. Havens, is entitled to the care, custody, companionship, and education of said Ella Nettie Havens."

The evidence is not preserved in the transcript, and the only question to be considered by the court is, whether or not the conclusions of law are sustained by the findings of fact.

Were the question of the *right* of the father the only question to be considered, we should, perhaps, coincide with the conclusions of law as stated by the district court.    It is true this legal right was at one time, in the early history of our jurisprudence, fully recognized both by the courts of England and of this country; and it is, in part, made the law of this state by section 6, chapter 34 of the Compiled Statutes, which provides that, "The father of the minor, if living, and in case of his decease, the mother, while she remains unmarried, being themselves respectively competent to transact their own business, and not otherwise unsuitable, shall be entitled to the custody of the person of the minor and to care for his education."

Were this section alone to determine the rights of the parties, and were the rule here laid down an inflexible one, it would not only decide this case in favor of the defendant in error, but in a proper case it would deprive the mother of the control or education of her children, upon

the decease of the father and her remarriage, without any reference to the best interests of the children, and in that case it might be conceded that she was in every other respect worthy and qualified, that she had ample means and was greatly attached to her children, and her remarriage might place them in a better condition, morally, socially, and financially; and yet this section of the statute, if strictly followed by the courts, would override every consideration of the welfare of her children, take them from her and place them in the hands of strangers. Such could not have been the intention of the legislature which passed this section of the law. It is true that this section is declarative of the law in its general sense, but we cannot agree with the defendant's counsel and decide the cause upon the rule there laid down, unaided by recent judicial decisions or the circumstances of the case. But rather, taking our statute as a general guide, we will look to the particular necessities of the case and give our special attention to the best interests of the child about whom this unfortunate controversy has arisen.

In Schouler's Domestic Relations, section 248, it is said that, "The American rule is not, however, one of fixed and determined principles. Much must be left to the peculiar surroundings of each case." And see also *Cook v. Cook*, 1 Barb., Ch. 639. *Daily v. Daily,* Wright, 514. "The primary object of the American decisions is to secure the welfare of the child and not the special claims of one or the other parent," and "the cardinal principle relative to such matters is to regard the benefit of the infant, to make the welfare of the child paramount to either parent." Id.

In *The United States v. Green*, 3 Mason, 382, Judge Story uses the following language: "It is an entire mistake to suppose that the court is bound to deliver over the infant to its father, or that the latter has an absolute vested right in the custody" of such infant.

In the case of *Gishwiler v. Dodez*, 4 Ohio State, 617, the

supreme court of Ohio has held that "whatever difference of opinion may have obtained upon other points of this interesting and important subject, it is universally agreed that neither of the parents has any rights that can be made to conflict with the welfare of the child, and that the order of the court should be made with a single reference to its best interests."

*In re Margaret Eliza Waldron*, 13 Johnson, 419, it is said: "From the affidavits which have been laid before the court, little doubt can be entertained that it will be more for the benefit of the child to remain with her grandparents than to be put under the care and custody of her father; and if this court has any discretion in such case it will no doubt be discreetly exercised by permitting the child to remain where she is." The motion for the writ was denied. See also *Corrie v. Corrie*, 42 Mich., 509.

From a careful examination of the authorities at our command we think the prevailing rule in this country may be briefly stated to be, that in controversies similar to this, especially where the infant is of the tender age of the one contended for, the court will consider only the best interest of the child, and make such order for its custody as will be for its welfare, without any reference to the wishes of the parties.

Applying this rule to this case we are forced to the conclusion that the conclusions of law as stated by the district court are not sustained by the findings of fact, and that the judgment of the court should have been in favor of the plaintiffs in error.

It is no doubt true that the defendant in error is greatly attached to this child, and the facts as found by the court show that he is in every respect a suitable person to have its care and custody. But when we consider his age and want of experience, we are driven to the conclusion that, *personally* he could not care for the wants of a child so young and helpless. True he has means and has employed

a suitable nurse, yet so far as we are informed this nurse is a stranger to the child, and of course does not feel that personal interest in its welfare as would be felt by a near relative. The grandparents have had the custody of the child since its birth, are greatly attached to it, have ample means to provide for its wants, and have the judgment and experience so essentially necessary in rearing a child of its age.

It seems to us no further reasoning is necessary to convince anyone that it is better for the child to remain where it is until such time as its age and condition will justify the father in assuming its custody.

It is scarcely necessary to notice the contract which is alleged to have been made prior to the death of the wife of the defendant in error. Whatever influence this should have upon the action of the parties, as viewed from a moral standpoint, we are not inclined to give it any consideration at this time as affecting the duty of the court with reference to the present interests of the child.

The judgment of the district court is reversed, and the relation dismissed.

REVERSED AND DISMISSED.

THE other judges concur.