EMMA SCHROEDER ET AL. v. STATE OF NEBRASKA, EX REL. JAMES B. FILBERT.

FILED SEPTEMBER 18, 1894.  No. 6762.

1. **Custody of Infants.** In a controversy for the custody of an infant of tender years the court will consider the best interests of the child and will make such order for its custody as will be for its welfare, without reference to the wishes of the parties. *Sturtevant v. State*, 15 Neb., 459, *Giles v. Giles*, 30 Neb., 624, and *State v. Schroeder*, 37 Neb., 571, approved and followed.

2. **The right to the custody of an infant child** which the law confers upon its father is not for the benefit of the father, but for the benefit of the child; and this right of custody is conferred on the father because the law presumes that he will avail himself of the child's custody for its benefit; but he may forfeit his right to the custody of his child by abandonment.

ERROR from the district court of Cass county. Tried below before AMBROSE, J.

*Byron Clark,* for plaintiffs in error.

*A. N. Sullivan, contra.*

RAGAN, C.

James B. Filbert, as relator, instituted in the district court of Cass county *habeas corpus* proceedings against Emma Schroeder and Frederick Schroeder, her husband, as respondents, for the purpose of having the custody of Florence A. Filbert and Angela G. Filbert, relator's minor children, taken from the respondents and awarded to him, the relator. From the order of the district court denying the application Filbert prosecuted a proceeding in error to this court, where the judgment of the district court was affirmed. (See *State v. Schroeder,* 37 Neb., 571.) The present is a supplemental proceeding in the same case, between the same parties, and for the same purpose as the original proceeding. The learned judge of the district court, on the hearing of the supplemental proceeding, made an order awarding the custody of the children to the relator, and from that order the respondents prosecute error to this court. Many of the facts in the case will be found in the case reported in 37 Neb., 571. These children are two girls, five and seven years of age, respectively. The relator is their father. Their mother is dead. The respondents are the step-grandfather and step-grandmother of the children.

The doctrine of this court is that in a controversy for the custody of an infant of tender years the court will consider the best interests of the child and will make such order for its custody as will be for its welfare, without any reference to the wishes of the parties. This was the rule announced in *Sturtevant v. State,* 15 Neb., 459. This case

was cited with approval and followed in *Giles v. Giles*, 30 Neb., 624, and again in *State v. Schroeder*, 37 Neb., 571. This is the doctrine of the American courts without any exception, so far as I am aware. It has also been the doctrine of the English courts since 1840. We have then the question, does it appear from the evidence in the record that it would be for the best interests of these minors that they should be given into the custody of the relator? A study of the evidence in the record leads us to the conclusion that it would not. The relator married the mother of these children in May, 1885. The children's mother was at that time living in Cass county, Nebraska, with the respondents, who had reared her. Soon after the relator's marriage he removed with his wife to Hastings, Nebraska, where he resided until the spring of 1886. He and his wife then took up their residence in the village of Kenesaw, Nebraska, where they remained until about December, 1890. In April, 1890, while the relator and his wife were residing in Kenesaw, trouble arose between them. The relator charged his wife with being criminally intimate with one E. N. Crane, a citizen of Kenesaw. The relator brought suit against his wife in the district court of Adams county for a divorce on the ground of adultery, and at the same time instituted a suit for damages against Crane. These suits, however, were never prosecuted, but in September, 1890, were dismissed for want of prosecution. The relator and his wife then effected a reconciliation, and about December of that year removed to Custer City in South Dakota, and there resumed their marital relations. Soon after the relator took up his residence in Custer City he converted into money a printing press and its paraphernalia, the property of his wife, and told her that he was going to Deadwood for the purpose of going into business. Instead of this, however, he went at once to Bloomington, Indiana, and entered the law school of the state university in that city,

and there remained until after the death of his wife, which occurred some time in July, 1891. From the time relator left Custer City he concealed his whereabouts from his wife, and did not know of her death until some time in 1892. It also appears from a letter in the record, written by the wife to her step-mother, respondent, bearing date December 20, 1890, that at that time the relator had been gone from his wife and children for four weeks; that she did not know of his whereabouts; and that he had left her only five dollars for the care of herself and children. From the time the relator left his family in Custer City until the time of the mother's death, in July, 1891, the relator not only kept his whereabouts concealed from his wife and children, but contributed nothing to their support. In July, 1891, the mother died among strangers at Ottawa, Kansas, and a banker of that city took possession of the little children. It also appears from the record that the relator's wife, during her last sickness, expressed a desire that her sister, a Mrs. Dewey, should have the custody of the children in controversy in this action. Soon after the death of the relator's wife this Mrs. Dewey and the respondent, Mrs. Schroeder, went to Kansas, and there Mrs. Dewey gave possession of the children to Mrs. Schroeder,—the reason for this being that Mrs. Dewey was not in good health and had a family of her own, and that Mrs. Schroeder had no family and was anxious for the children, and was abundantly able financially to maintain, educate, and rear them as they should be. Mrs. Schroeder thereupon took the children to her home, where they have since resided, and in all respects been treated as though they were her own children. It also appears that when the relator first learned of the death of his wife,—early in the year of 1892,—the first thing he did was to write to the county judge of Adams county, Nebraska, inquiring as to whether an administrator had been appointed for the property of his wife. Mrs. Filbert died the owner of certain

real estate in that county. The relator made no inquiry about his children. In August, 1892, he first visited his children at the home of the respondents. This was the first time that he had seen them since he abandoned them in Custer City in December, 1890.

We have no concern here with the merits or demerits of the trouble between relator and his wife. Whether she was faithful or unfaithful is wholly immaterial in this controversy. The relator has not hesitated in this record to charge her with unchastity. Indeed, he has gone so far at one time as to doubt whether he is the father of the younger of the children whose custody he now seeks to obtain; but we cannot say upon our oaths and consciences that we believe that it is for the best interests of these little children that they should be given into the custody of the relator. The evidence constrains our judgments to the conclusion that it would not be for the best interests of the children that they should be taken from the custody of the respondents and given to the relator, notwithstanding the fact that he is their father. These respondents are exemplary people, somewhat advanced in years, possessed of considerable property, without children of their own, anxious, ready, and willing, not only to maintain, educate, and rear these children, but to adopt them as their own and make them their heirs at law. Between the respondents and these little children the closest and strongest ties of affection have grown up. These children call the respondents "father and mother." They look upon and regard the relator simply as "Mr. Filbert." They do not love him. A child is not a chattel; nor is there any such law as invests the father with an inalienable right to the custody of his child. A child is a human being. It has rights and interests of its own. How came these little children into the custody of respondents? Whose fault was it that when their mother died they found themselves not only motherless but homeless, without food, without shel-

ter, without clothing,—waifs among strangers? The evidence in this record points to the relator and says, "It is yours."

We desire in this case to do no more and say no more than is our duty. We desire only to be governed by the rule of law announced above, and make such order as will be for the best interests of the children; but we cannot escape the conviction that the solicitude of the relator for their custody at this time is prompted by his desire to control the property which was inherited by their deceased mother. Perhaps this is only an inference from the evidence, and unjust, but nevertheless it is our conviction. Not only does the evidence prevent us from saying and deciding that the best interests of the children will be subserved by transferring their custody to the relator, but the evidence affirmatively shows that the relator has relinquished all claims on these children by his abandonment of them. The right to the custody of an infant child which the law confers upon the father is not for the benefit of the father, but for the benefit of the child. This right of custody is conferred upon the father because the law presumes that the father will avail himself of the custody of the child for the child's benefit; but he may lose this right if he abandons the child. (*Nugent v. Powell*, 33 Pac. Rep. [Wyo.], 23; *Green v. Campbell*, 14 S. E. Rep. [W. Va.], 212; *Clark v. Bayer*, 32 O. St., 299.)

It is but just to the learned district judge who heard this case to state that he had not before him all the evidence on which this opinion is predicated, and had such evidence been before him he would doubtless have reached the same conclusion we have.

The judgment of the district court is reversed, and the *habeas corpus* proceedings dismissed.

REVERSED AND DISMISSED.