ANNIE J. NORVAL V. JACOB ZINSMASTER.

FILED DECEMBER 8, 1898.   No. 10346.

1. **Custody of Children:** RIGHTS OF PARENTS. The statute and the de-
mands of nature commit the custody of young children to their
parents rather than to strangers, and the court may not deprive
the parent of such custody unless it be shown that such parent
is unfit to perform the duties imposed by the relation or has for-
feited the right.

2. ———: ———. The right of a parent to the custody of a child
is not lost beyond recall by an act of relinquishment performed
under circumstances of temporary °caprice or discouragement.

3. ———: ———: DIVORCE: HABEAS CORPUS. When a decree of di-
vorce has settled the custody of children in one of the parents,
the court should not, in habeas corpus proceedings, in effect give
them into the custody of the other, by committing them to the
care of strangers with whom that other makes his home.

ERROR from the district court of Johnson county.
Tried below before STULL, J.   *Reversed.*

*W. W. Giffen* and *W. H. Jennings,* for plaintiff in error.

*Tracey & Wild, contra.*

IRVINE, C.

Annie J. Norval sued out a writ of habeas corpus against Jacob Zinsmaster, alleging the unlawful restraint by him of the applicant's two minor children. The district court, after a trial, awarded the custody of the children to the respondent, their paternal grandfather. From this order the applicant prosecutes error. The assignments of error reduce themselves to a question of the sufficiency of the evidence.

There is little real controversy as to the facts. The children are two girls, aged respectively eight and five, the offspring of a marriage between the applicant and George Zinsmaster, son of the respondent. In February, 1897, the applicant was awarded a decree of divorce on the grounds of drunkenness and extreme cruelty, and given the custody of the children. A little more than six months thereafter the applicant intermarried with Walter Norval. The former husband was opposed to this step, and filed an application in the divorce case for a modification of the decree so as to award him the custody of the children. This application does not seem to have been brought to hearing; but apparently influenced thereby Mrs. Norval wrote to a son-in-law of respondent suggesting that the latter take the children. The letter not receiving an immediate response she addressed the respondent directly as follows: "I thought it best I should write to you about the girls. We have gotten word that George [the father] is working in an underhanded way to get them, and rather than have any fuss and go to law about them I will be willing for them to have their home with you. He can provide for them as much as he likes, but never have control over them to take them away in some other home, and that they can come and see me in vacation, providing they will stay there contented and happy. Now let me know right away if this is satisfactory and I will bring them down. They have a good home here and will always

have, but to save trouble I would rather let them go there." The defendant in error, a German who could not write English, directed his adult maiden daughter to write Mrs. Norval that he would take the children if she would relinquish all claim upon them. The daughter wrote Mrs. Norval to bring the children to Cook, which seems to be the nearest railway station, but omitted to state the condition. The girls were sent to Cook about October 17, 1897, and were there met by their father, who took them to the home of the elder Zinsmasters. This proceeding was begun February 23, 1898.

No serious attempt is made to prove that either claimant is an unfit person to have the custody of the children. All the proof tends to show that the mother and the grandparents are estimable persons, exhibiting a deep affection for the children, and willing to provide for them to the extent of their respective means. Mrs. Norval resides with her husband in a small house at Avoca, Cass county. Norval is a section-hand on a railroad and derives his income chiefly from his wages as such. The grandparents own a farm of 240 acres near Tecumseh, and reside thereon. At each point good school facilities are convenient. The testimony of strangers as to the situation in either household is enlightened by that of the two little girls themselves, the innocent subject-matter of the controversy. Each testifies, with apparent candor and freedom and with manifest intelligence, that she has received uniformly kind treatment in each place, and that her wants have been supplied and gratified. The elder does not know which place she would prefer to live; the younger at one time says she wants to go home with grandma, in another that she does not care. The only objection made by the mother to the custody of the grandfather, and based on the welfare of the children, is that their father resides there and is an habitual drunkard. The only objection based on similar grounds made to their mother's custody is that Norval's income is quite limited and that he is addicted to drink. The

proof on the last point only tends to establish that on several occasions within six years, and on none since his marriage, he has been intoxicated.   He is shown to be industrious and to devote his means to the support of the household.   The result of the evidence is that both mother and grandparents are in themselves fit to maintain and rear the children.   The stepfather is a poor man, but industrious.   At times he has been intoxicated.   As against this it is established that such is the frequent if not usual condition of the father, who resides with the grandparents, and who, by reason of his relationship, would probably be at least as closely associated with the  children, should they remain, as would the stepfather, should the mother regain the custody.   An attempt is made to show that the father does not live with the grandparents; but this attempt merely results in disclosing that he is without means of livelihood, apparently vagabondish in his habits, and stays at his father's home when he is not roaming among places which on the witness stand he refuses to divulge.   The plaintiff in error asserts that her claim to the children is founded on the law of God.   Without trespassing on the domain of theology, it must be conceded that it is based on a law which nature asserts and the statutes recognize.   Section 6, chapter 34, Compiled Statutes, provides: "The father and mother are the natural guardians of their minor children, and are equally entitled to their custody, and to care for their education, being themselves competent to transact their own business and not otherwise unsuitable."   We are aware that this court has several times asserted that in such controversies as the present the order should be made with sole reference to the best interests of the child.   But this has been broad language applied to special cases.   The court has never deprived a parent of the custody of a child merely because on financial or other grounds a stranger might better provide.   The statute declares and nature demands that the right shall be in the parent, unless the parent be affirma-

tively unfit. The statute does not make the judges the
guardians of all the children in the state, with power to
take them from their parents, so long as the latter dis-
charge their duties to the best of their ability, and give
them to strangers because such strangers may be better
able to provide what is already well provided. If that
were the law, it would be soon changed, by revolution if
necessary. In *Sturtevant v. State*, 15 Neb. 459, the child
was only a few months old, and the custody was taken
from the father because he was unable personally to
discharge duties which the custody imposed. *Giles v.
Giles*, 30 Neb. 624, was a controversy between father and
mother, where the natural rights were equal. *State v.
Schroeder*, 37 Neb. 571, and *Schroeder v. State*, 41 Neb. 745,
presented a case of affirmative unfitness of the father
and of abandonment of the child.

We are not unmindful that the letter of Mrs. Norval,
already quoted, indicates an intention, at the time it was
written, of surrendering the children to their grandpar-
ents; but parentage in its full import is not to be so
lightly surrendered. If, relying on the letter, the grand-
father had maintained the children for a considerable
period, using extensively of his means and energies, and
forming deeply-seated ties of affection growing out of the
association, such facts might be of controlling force.
But, regarded as a contract, the letter is indefinite, and
the motive of writing it was plainly to avoid the jeopardy
of an attack by the father on the mother's rights. The
children had remained but a few months, and the grand-
parents had not expended largely of their time or means
on the faith of their continued control of the children.
The right to custody of children implies a correlative
duty of the very highest obligation. It cannot be di-
vested or forfeited beyond recall by a letter written in
a moment of caprice or discouragement. It is also to be
observed that, under the circumstances, to award the
custody to the grandfather is in effect to take the chil-
dren from their mother and place them in constant asso-

ciation with their father, and so submit them to his moral control and direction, and this in conflict with the terms of the decree of divorce. This will not be done. (*Eckhard v. Eckhard*, 29 Neb. 457.) The right of the parent is not lightly to be set aside, and it should not be done where unfitness is not affirmatively shown, or a forfeiture clearly established.

REVERSED AND REMANDED.