STATE, EX REL. WILLIAM H. THOMPSON ET AL., APPELLEES,
v. WALLACE PORTER, APPELLANT.

FILED MAY 10, 1907.  No. 14,830.

1. Habeas Corpus: WRIT: ISSUANCE. The district court, or a judge thereof at chambers, may in the exercise of a sound legal discretion, when the right of personal liberty makes it necessary, issue a writ of habeas corpus to another county of the state outside of his judicial district.

2. ———: CUSTODY OF CHILD. In a controversy for the custody and control of a minor child between the grandparents and the father of the child, there is a strong presumption that the interests of the child require that it be confided to the care of its father; but, when the circumstances and condition of the parties, and their character and purposes in regard to the child, show that it will probably be for its best interest to remain temporarily with its grandparents, who have for some time, with its father's consent, cared for the child and furnished it with a suitable home, the rights of the father must yield to the welfare of the child.

APPEAL from the district court for Hall county: JAMES R. HANNA and JAMES N. PAUL, JUDGES. *Affirmed as modified.*

*Harrison & Prince,* for appellant.

*John R. Thompson, R. R. Horth, Charles G. Ryan* and
*O. A. Abbott, contra.*

SEDGWICK, C. J.

These relators applied to one of the judges of the dis-
trict court for Hall county for a writ of habeas corpus to
regain the custody of a little boy then about three and
one-half years old. Upon the application the court made
an order, which recited that the boy, "a resident of said
Hall county, has been unlawfully taken by force and
strong hands from the county of Hall, and is now unlaw-
fully detained in the county of Douglas, in said (state),
by the said Wallace Porter," and continued: "It is there-
fore ordered that a writ of habeas corpus issue to the
sheriff of Hall county, commanding him to bring the body
of said Eugene Thompson Porter forthwith before me or
some other judge of the Eleventh judicial district, at
Grand Island," etc. Pursuant to this order the writ was
issued and delivered to the sheriff of Hall county, who took
possession of the boy in Douglas county, and conveyed him
to Hall county, and returned his writ as follows: "I do
hereby certify that I received this writ on the 8th day
of February, A. D. 1906, at the hour of 8 o'clock P. M.,
and according to the command thereof I did on the 9th day
of February, A. D. 1906, take the body of Eugene Thomp-
son Porter into my custody in Douglas county, Nebraska,
and at the same time and place delivered a copy of this
writ to E. J. Porter, the person then having the custody
of the said Eugene Thompson Porter, and afterwards to
wit, on the 9th day of February, A. D. 1906, I served the
within writ on the defendant, Wallace Porter, by deliver-
ing to him a true and certified copy of this writ, with all
indorsements thereon, in Hall county, Nebraska, and now
have the body of said Eugene Thompson Porter before this
court as commanded by said writ. M. Dunkel, Sheriff,

Hall county." The respondent, Wallace Porter, is the father of the boy, and it appears from the evidence that, when the boy was taken by the sheriff in Douglas county, the respondent returned with the sheriff who had the boy in custody to Hall county, and was there served with a copy of the writ.

1. The respondent objected to the jurisdiction of the court. This objection was overruled, and the first assignment of error in the proceedings is based upon this ruling. The objection is that the judge of the district court has no jurisdiction to issue a writ of habeas corpus to another county outside of his judicial district. This theory seems to be sanctioned by the practice of the federal courts. 21 Cyc. 309, and cases cited. From the same authority it would seem also to be the rule in most of the states; but it is manifest, as said in the text on page 311, that "the extent of the territorial jurisdiction of the different courts and judges is of course dependent largely upon statutory provisions." The provisions of our statute bearing upon this question are unfortunately somewhat uncertain in their character. The supreme court of Kansas, in *In re Jewett,* 69 Kan. 830, 77 Pac. 567, appears to consider that under the provisions of their constitution and statutes the district courts of that state have no jurisdiction beyond their respective districts. The proceedings are civil in their nature. This is the general doctrine and has frequently been approved by this court. The constitution of Kansas provides: "The district court shall have such jurisdiction in their respective districts as may be provided by law." Article 3, sec. 6. We have no such provision in our constitution. Our district courts are given general chancery and common law jurisdiction. The constitution created six judicial districts, and provided that there should be elected a judge in each district "who shall be judge of the district court therein," and it provided that the legislature might redistrict the state. The provision of the constitution of Kansas in regard to the powers of the judges of the several courts at chambers appears to be

the same as our own. "The several justices and judges of the courts of record in this state, shall have such jurisdiction at chambers as may be provided by law." Article 3, sec. 16. It may be that the decision of that court above cited was necessary under the provisions of their constitution and their legislation, but their discussion of the reason and necessity for such legislation does not seem entirely satisfactory. The court said: "For under such holding (that the district court might send the writ to another county outside of the district) the probate judge of the remotest county in the state might require the production before him of every one confined, not only in the state penitentiary, but in all of the county jails and various houses of detention within the state—a result which would serve much to deter us from reaching such a conclusion, if deterrent were necessary." This evil, great as it may seem, is not more apparent than the counter evil resulting from a converse rule. As is well said in the brief of relators: "The kidnaper or child stealer could select his own venue, his own place of trial, and compel parties and their witnesses to go there, and possibly change his place of confinement as necessity of avoiding the writ might require." It seems that very serious results might follow from an indiscreet application of either rule contended for. Some of the courts have intimated that it should rest in a measure in the sound legal discretion of the court to which the application is made. It may be that this thought accounts for the condition of our legislation upon the subject.

The boy was a resident of Hall county. He had been living with the relators for some time. The respondent came to visit him, and with the consent of the relators took the boy from the house, where he lived several times. Before this consent was given, the question was discussed whether the respondent was entitled to the custody of the boy, and, the parties not having been able to agree upon that point, the relators requested some assurance that the respondent would not take the boy away from their cus-

tody without some prior understanding in regard to the matter. They say that they understood the respondent to agree that he would not do so. However that may be, when an opporunity offered, the respondent took the boy and departed at once for Douglas county. There is no doubt, under any construction of the statute, that if the respondent had so taken the boy, and while he was still in Hall county, the district court of that county had jurisdiction to issue the writ, so that the question seems to be whether the respondent could himself deprive the court of that jurisdiction, and we have no hesitancy in holding that the application was properly made in Hall county. Section 368 of the criminal code provides: "Such writ may be served in any county by any sheriff of the same or any other county," and section 355 provides that a subpoena may be issued "to the sheriff of the county where said person shall be confined." We are not aware that this court has directly passed upon this question, but it has several times impliedly approved of the practice of sending the writ to another county outside of the district in which it was issued. In *Buchanan v. Mallalieu,* 25 Neb. 201, a writ of habeas corpus was issued by the district court for Gage county, directed to the superintendent of the state industrial school for juvenile offenders in Buffalo county. No question was raised in the case of the propriety of so doing, and the point is not mentioned in the opinion of the then Chief Justice REESE. Also, in *McCarty v. Hopkins,* 61 Neb. 550, the writ was issued by the district court for Douglas county, directed to the warden of the penitentiary in Lancaster county, and again Mr. Justice SULLIVAN discusses the questions raised in the case without suggesting any impropriety in the practice pursued. In *In re White,* 33 Neb. 812, the court said: "As a general rule, therefore, the proceeding should be instituted in the county where the alleged unlawful restraint is being exercised, and where, if it is necessary to call witnesses, the parties will not be subjected to unnecessary expense and inconvenience." This

language would seem to recognize the jurisdiction, but suggests that the matter of inconvenience and expense should be taken into consideration in exercising the jurisdiction. In *Eager v. Eager*, 74 Neb. 827; it is said: "The district court is a court of general jurisdiction and may send its original process to any part of the state, unless restricted therein by statute." It would seem that the practical construction that has been given to our statute for many years would justify the conclusion that the judge of the district court did not abuse the discretion given him in exercising the jurisdiction complained of.

2. The next question presented is a much more difficult and embarrassing one. The relators are the grandparents of the child. They have carefully cared for it since the death of its mother, which occurred at the home of the relators in September, 1901. They have evidently given the child the best of care. As far as the evidence shows they have done all that a father and mother could do for its welfare, and manifested the highest regard for its best interest. Their situation in life is such as to enable them to furnish this boy with every advantage. No attempt is made to controvert any of these propositions. The respondent is the child's father, and the laws of nature, as well as the common law of our country, declare that the best interests of every child demand that it shall have a father's care. The first query in controversies of this kind should always be: What do the best interests of the child require? And in determining this question due regard should be had to the rights and feelings of its parents, who are its natural guardians. The presumption always is that the father and mother are the most competent to determine what is best for the child, the most interested to determine rightly, and the best fitted to succeed in its successful nurture and training. The respondent is shown to be a young man of excellent character. Mr. Thompson, who knows him well, testifies that he has no bad habits. He is a bright, intelligent, industrious young man, devotedly attached to his boy, and, without doubt,

seeking earnestly to promote his welfare in every way possible. Both the relators and the respondent are in a position to know what is for the best interest of the boy, better than the court can determine, and, if they agreed, no court would hesitate to act upon their conclusion; but, unfortunately, they are not agreed, and, while both parties are acting in undoubted good faith, they are equally confident that they are unselfishly seeking the welfare of the child. The relators have a comfortable home in Grand Island, where they have lived for many years. They regarded their daughter, the mother of the child, with more than usual parental tenderness, and they say that shortly before her death, and also before the birth of the boy, she requested that in case anything should happen to her they would take care of her child. Immediately after her death they communicated this request to the respondent, and the result was that an agreement was entered into between the relators and the respondent, in which it was recited that it was the wish of the boy's mother that he "should make his home with her father and mother and have their friendly care and assistance," and that the respondent joined in that wish and decided to "aid in every way in carrying the same into full execution," and for that purpose the respondent agreed that, "if I shall remarry at any time during the minority of said son, I will, and do hereby, voluntarily relinquish all right to the custody and power over the said Eugene Thompson Porter, and all claim and interest in and to his services and wages, to the end that said parents of my wife shall have full and complete charge and control of the said Eugene Thompson Porter after the happening of the aforesaid event, and from that time until my said son becomes of age. And also that, if I should die prior to my said son's coming of age, he be left in the full care, custody and control of the aforesaid parents of my wife, or either of them that might be living at that time, until he becomes of age." In this contract the respondent also

agreed "that I will not at any time during the life of my said father-in-law and mother-in-law, or either of them, in any manner give the care, custody and control of the said child to any other person or persons, or place the said child in any other or different home, as long as the said William H. Thompson's and Nettie I. Thompson's home is my home, which shall be as long as I am fairly treated."

As the respondent did not remarry nor die during the minority of his son, the provisions conditioned upon these events, of course, are not effective. The child remained with the relators as long as their home was the respondent's home, and, of course, there is no question of the violation of that part of the agreement. It will be observed that the respondent agreed to make the relators' home his home as long as he was fairly treated, and, if this case depended in any way upon the construction and meaning of this contract, it would become very important to inquire whether the respondent was justifiable in leaving the home of the relators. Such contracts, of course, are always to be subject to the best interest of the child, and are never to be enforced to the sacrifice of its interest. Moreover, it is due to the parties to this controversy to say in this connection that, although there is no substantial evidence in the record of any unfair treatment practiced by the relators against the respondent, still we think it ought not to be found from the evidence that the respondent was wholly unjustifiable in leaving the home of the relators. The relations between Mr. Thompson and the respondent appear always to have been pleasant and just; neither of these two has any words of criticism for the other. There were, however, manifestly some misunderstandings between Mrs. Thompson and the respondent. The evidence fails to show any sufficient cause therefor. Mrs. Thompson desired that certain articles which she had presented to her daughter should be returned to her after her daughter's death. The respondent appears also to have prized these articles very much beyond their intrinsic value, and they were not returned to Mrs. Thompson.

Neither party appears to have been unreasonable in the matter, both being prompted by their great affection for the deceased wife and daughter.

A house and lot in Grand Island had belonged to the respondent and his wife. For some time they had made their home there. They procured it through the assistance of these relators and the parents of the respondent. After the death of the respondent's wife, this property was rented, and Mr. Thompson had charge of the collection of the rents. Out of these rents he paid taxes that had accumulated upon the property, and also made payments upon the respondent's life insurance. An account was kept by Mrs. Thompson, consisting of charges against respondent for meals and lodging, and also for various articles furnished for the child. She testified that the arrangement that the respondent should pay his board was at his suggestion, and that the amount to be paid was named by him, and that she always told him that it was wholly immaterial to her. We do not find that this testimony is disputed in the record, and there seems to be no cause for the misunderstanding between them arising out of these transactions. That each of these two recognized that their relations and feelings for each other were not such as are usually expected to exist between members of the same family manifestly appears from the evidence. The respondent testifies positively that in conversations between himself and Mr. Thompson they both recognized this fact, and that Mr. Thompson, just prior to the time that the respondent left relator's home, said that it would not be best for the respondent to continue longer to make his home with the relators, and that it was in accordance with this statement of Mr. Thompson that the respondent left their home. Mr. Thompson evidently did not intend that his remark should be understood to absolutely dismiss the respondent from his home. It would rather seem to be an acknowledgment on the part of Mr. Thompson that the existing conditions would justify the respondent in concluding that it would be

better that he should no longer remain a member of the family. Mr. Thompson does not contradict the evidence of the respondent in regard to their conversation referred to, and it seems clear that, within the purpose and spirit of their contract, the position of the respondent in the family was such as to justify him in seeking another home. The respondent accounts for the relations between himself and Mrs. Thompson by saying that Mrs. Thompson never liked him, and that she was always opposed to his marrying her daughter. While the home of the child was with the relators, the respondent was frequently there. These were occasions of great pleasure both to himself and his son. The relators do not seem to have interfered with them in any way, but rather to have encouraged these visits, and to have assisted the respondent in establishing himself in the boy's affections.

The respondent is a traveling man. While his wife was living, he was at home only occasionally, and since her death the conditions in that regard have remained substantially the same. In February, 1906, after he had left the home of the relators, he called there and informed them that he was going to take the child. They protested against it, and after some talk the respondent seemed to acquiesce in allowing the child to remain with the relators, at least for some time longer. Mr. Thompson suggested to the respondent that the matter of the custody of the child be left to the court; that they submit a friendly statement of the facts to the district court, and take the judgment of the court thereon and act accordingly; and, this not being acceptable, and Mr. Thompson being compelled to leave home for a few days, he suggested to the respondent that nothing should be done in regard to the taking away of the boy until his return. In this he understood the respondent to acquiesce. After Mr. Thompson had gone, the respondent took the boy out several times, and Mrs. Thompson testifies that, when he proposed doing so, she asked him if he was playing a trick on her, and he said that he was not, and took the child away and

brought him back again afterwards, and then, on a following day, taking the child away in the same manner, and without taking any clothing or other things that would indicate that he intended retaining the child, he went with the child to Omaha. In Omaha he had a home with his father and mother, which they had established together in a house which had been rented a month or more previously. The respondent says that he rented the house, and two receipts are in evidence showing that he paid rent for the house at $35 a month, for two months. On the evening of the same day that he took the child away, this application was made for a writ of habeas corpus, and by virtue of that writ the sheriff of Hall county took the child from the respondent and his parents in Douglas county, and returned with him to Hall county. A hearing was had in the district court for Hall county before both of the judges of that court sitting together, and by the judgment of the court the custody of the child was awarded to the relators. The record shows that the delicate duty thus imposed upon the judges of the district court was carefully and patiently performed. The witnesses gave their evidence in the presence of the court. The material facts are not substantially in dispute. What would the best interests of this little boy require of these judges? Judging alone from the words used by the witnesses, this question would be difficult to answer. The real interest and welfare of a child depend upon so many considerations of character, surroundings, and disposition as to require the nicest discrimination of judgment to solve such a question under circumstances like these. Many details of character and purposes, as well as of conditions and modes of living, that are of importance in selecting a home for a child cannot be described in words. The parties and their witnesses were before the trial court. The judges had an opportunity of observing those things which, when the evidence is otherwise evenly balanced, might turn the scale and control the decision. We cannot find from this evidence that the able judges who heard this case are

wrong in the matter. - Moreover, there are many things disclosed in the evidence which tend to support the decision. The respondent was not of age when he was married. He had before his marriage, and has since the death of his wife, made his home with his parents. That is, although for the most of his time he travels upon the road, he has had no other home except theirs. His father apparently is of a roving disposition. He has during the recollection of the respondent made his home in nearly a dozen different places—in Iowa, Kansas, Nebraska, and other states. One of the purposes that led to the renting of the house in Omaha and establishing a residence there by the respondent and his parents was to enable the respondent to regain the custody of this boy. The respondent, although, according to his testimony, he has been able to earn from $125 to $150 a month for many years, has saved comparatively nothing from his earnings. The only means that he could mention as having accumulated consisted in household goods and furniture, mainly furnished to himself and his wife, while she was living, by their respective parents. He relies upon his mother to care for the boy, and, while she appears to be in all respects competent and suitable, she has not evinced any desire to assume such responsibility, but declared that she was not responsible for taking the child away from the relators, and that she had nothing to do with it.

While we cannot find that it is our duty to interfere with the judgment of the trial court, we feel that it is proper and necessary to say that this boy and his father must not be separated, and that the custody that is awarded to the relators should not be regarded as of a permanent nature. It may be that the events of a short time will demonstrate that the establishment of his home is permanent, and that such conditions will prevail that the benefit of a father's care and training will be of more importance to the child than any advantages that can come from denying a father's natural right. The decree of the district court provides that the relators shall have

the care and custody of the child until the further order of the court, but with the further restriction that no application shall be made to modify or change the order of the court "without leave of court upon good cause shown." We do not understand what force it was intended to give to this provision. Surely, if a showing is made that the conditions are so changed that the interest of the boy demands that the order should be modified, no other showing should be necessary, and we suppose that this was in fact the meaning of the court. If application is made in good faith to change or modify the decree, the court should hear the evidence and make such order thereon as the law requires.

We think upon the whole record the judgment is right, and as above modified it is

AFFIRMED.