DELORES BARNES, FORMERLY DELORES BRENNAN, APPELLEE, v. MABEL MORASH, APPELLANT.

57 N. W. 2d 783

Filed April 3, 1953. No. 33203.

*Maupin & Dent,* for appellant.

*Beatty, Clarke, Murphy & Morgan,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is a habeas corpus action brought by Delores Barnes, formerly Delores Brennan, as plaintiff, in the district court for Lincoln County to obtain the custody of a minor daughter, Delores Jean Brennan, sometimes referred to as Dolores Jeanne Brennan, from the defendant Mabel Morash, the paternal grandmother of the child. The basis of the action is that the minor child is unlawfully and forcibly detained by the defendant in violation of a decree of divorce rendered in the district court for Custer County. The plaintiff was granted a decree of divorce from Donald Brennan on February 7, 1950. The decree found the plaintiff to be a fit and proper person to have the care, control, and custody of the minor child.

The defendant's defense may be summarized as follows: That where an action for a divorce is predicated on constructive service, the court has no power to enter a decree determining anything other than the status of the parties, and any award of custody of the child under such a decree is void and unenforceable; that the plaintiff abandoned the minor child by her acts and conduct for a period of 3 years, from May 1947 until April 1950; and that the best interests and general welfare of the child will be served by not changing its custody or restoring its custody to the plaintiff.

The trial court heard the case on its merits and thereafter rendered a decree finding generally in favor of the plaintiff and against the defendant, and awarded the custody of the child to its mother, Delores Brennan,

now Delores Barnes. Defendant filed a motion for new trial which was overruled. The defendant appeals.

At the outset, the appellee raises the point that the divorce decree obtained by her on February 7, 1950, in the district court for Custer County from Donald Brennan, wherein she was awarded the custody of their minor child Delores Jean Brennan, is conclusive, and she is entitled to judgment on the pleadings, and this alone is sufficient to award the custody of the child in this action to her, regardless of the merits of the case. She pleads such facts in her petition.

The appellant pleads that the service obtained by the appellee on her husband was constructive service, therefore the only jurisdiction vested in the trial court was to determine the status of the parties, and such court was without jurisdiction to award the custody of the child, the subject of this litigation, to the mother.

The cases of Hanson v. Hanson, 150 Neb. 337, 34 N. W. 2d 388, and In re Application of Reed, 152 Neb. 819, 43 N. W. 2d 161, are cited by the appellant to sustain her position.

In the Hanson case this court held: "A judgment in a default divorce action affecting the custody of children, where there was no appearance by the defendant who was served by personal service in another state where she and her children are domiciled, is subject to collateral attack by habeas corpus.

"Court granting divorce decree on constructive service against nonresident defendant is without jurisdiction to fix the custody of the parties' minor children living at the time with such defendant and never within the state where the divorce proceedings were instituted."

It will be observed that in the Hanson case the childrens' domicile was with their mother in California, as distinguished from the instant case where the child is domiciled in this state and has always resided here where the divorce was obtained, which distinguishes the Hanson case from the instant case. To like effect

as the holding in the Hanson case see Kline v. Kline, 57 Iowa 386, 10 N. W. 825, 42 Am. R. 47.

In Weber v. Redding, 200 Ind. 448, 163 N. E. 269, it is said: "* * * the weight of authority is in favor of confining the jurisdiction of the court in an action for divorce, where the defendant is a non-resident and does not appear, and process upon the defendant is by substituted service only, to a determination of the status of the parties." This rule of law extends to children who are not within the jurisdiction of the court when the divorce is rendered, where the defendant is not a resident of the state of the seat of the court, and has been neither personally served with process nor appeared in the action.

In the case of In re Application of Reed, *supra,* we held: "A decree of divorce of a court of another jurisdiction, awarding the custody of the child of the parties to one of them, rendered while the child is in this jurisdiction, does not preclude the courts here from determining the question of the custody of the child; and in a habeas corpus proceeding brought to enforce such foreign decree, the full faith and credit clause of the Constitution is not involved." We believe the distinction between this cited case and the instant case is obvious.

The appellee relies on the case of Matthews v. Matthews, 247 N. Y. 32, 159 N. E. 713, and other cases of like holding to the effect that in a divorce or separation action against a nonresident defendant served by publication, the court may determine the custody of children who are within the state. See, also, Beckmann v. Beckmann, (Mo. App.), 211 S. W. 2d 536; Beckmann v. Beckmann, 358 Mo. 1029, 218 S. W. 2d 566, 9 A. L. R. 2d 428; In re Estate of Newman, 75 Cal. 213, 16 P. 887, 7 Am. S. R. 146; Wakefield v. Ives, 35 Iowa 238; Minick v. Minick, 111 Fla. 469, 149 So. 483; McGuinness v. McGuinness, 72 N. J. Eq. 381, 68 A. 768.

In 25 Am. Jur., Habeas Corpus, § 82, p. 207, it is said: "The decree rendered in a divorce suit, award-

ing custody of a child, must be recognized and given effect in a subsequent habeas corpus proceeding between the same parties, involving the right to the custody of that child, * * *."

It has also been held that a prior divorce decree determining custody, although binding as between the parents, is not a bar to a subsequent habeas corpus proceeding to determine custody, since the decree did not consider the position of the state as parens patriae and the welfare of the child. See Wear v. Wear, 130 Kan. 205, 285 P. 606, 72 A. L. R. 425. And, a divorce decree is not conclusive in a subsequent habeas corpus proceeding where the parties to the two proceedings are not the same. See 39 C. J. S., Habeas Corpus, § 46, p. 584.

In the instant case it will be observed that the parties are not the same as in the divorce proceedings. In this case the mother of the child is seeking its custody against the paternal grandmother. The husband is not a party to this action. Any relief that the husband may be entitled to must be in the court where the decree was rendered, as provided for by law. The paternal grandmother was not a party to the divorce action. She was not required to intervene in such action with reference to the custody of the child here in controversy. She is not in a position to attack the validity of the divorce decree in this action. However, as will become apparent later in the opinion, in an action in habeas corpus involving the custody of a child, she is entitled to resist and defend the right to retain the custody of the child.

"In general, the writ of habeas corpus has been extended to, and may be used in, controversies regarding the custody of infants. Such proceedings are governed by considerations of expediency and equity, and should not be bound by technical rules of practice." In re Application of Reed, *supra*.

This jurisdiction, in habeas corpus actions instituted in the courts of this state for the custody of a minor

child, has for a period of more than 60 years adhered to the following rule. In Sturtevant v. State, 15 Neb. 459, 19 N. W. 617, 48 Am. R. 349, it was held: "In such a controversy for the custody of the child the order of the court should be made with a single reference to the best interests of such child." In the opinion the court said: "But rather, taking our statute as a general guide, we will look to the particular necessities of the case and give our special attention to the best interests of the child about whom this unfortunate controversy has arisen." See, also, Giles v. Giles, 30 Neb. 624, 46 N. W. 916; State ex rel. Filbert v. Schroeder, 37 Neb. 571, 56 N. W. 307; Schroeder v. State, 41 Neb. 745, 60 N. W. 89; Norval v. Zinsmaster, 57 Neb. 158, 77 N. W. 373, 73 Am. S. R. 500; State ex rel. Thompson v. Porter, 78 Neb. 811, 112 N. W. 286; State ex rel. Britton v. Bryant, 95 Neb. 129, 145 N. W. 266; State ex rel. Edmisten v. Highberger, 103 Neb. 258, 170 N. W. 906; In re Application of Schwartzkopf, 149 Neb. 460, 31 N. W. 2d 294; Kaufmann v. Kaufmann, 140 Neb. 299, 299 N. W. 617; Hanson v. Hanson, *supra;* In re Application of Reed, *supra.*

In Steward v. Elliott, 113 Neb. 421, 203 N. W. 580, the court said: " 'In a controversy for the custody of an infant of tender years, the court will consider the best interests of the child, and will make such order for its custody as will be for its welfare, without reference to the wishes of the parties.' " See, also, Schroeder v. State, *supra.*

In Kaufmann v. Kaufmann, *supra,* the court said: "The welfare of the child being the one question of primary consideration to which all others must yield, the court must patiently examine the evidence in the light of the age of the child, its past and future. The question involves the study of the proposed home itself, and its entire surroundings, the temporal welfare of the child, as to food, clothing, discipline, and, if of tender years, careful nursing when required, and medical attention. Then the court must consider its spiritual and

religious care and upbringing, and whether it will have loving care, with understanding and affection: In which of two proposed homes will the child have the * * * better advantages for being fitted for its place in the world?"

In the case of In re Burdick, 91 Neb. 639, 136 N. W. 988, the court said that the welfare of an infant is paramount to the wishes of the parent.

The welfare of the child is considered to be the controlling question, to which any arbitrary legal right of guardianship must yield, it being the endeavor of the court to promote the child's best interest, pecuniary, social, and moral. See Kaufmann v. Kaufmann, *supra.*

We believe the foregoing cited authorities disclose the manner in which the writ of habeas corpus involving the custody of a minor child has been considered in this jurisdiction.

The record discloses that the appellee had unfortunate experience insofar as her matrimonial ventures and status were concerned. We believe it will serve no useful purpose to set it out in detail in this opinion. Suffice it is to say that in her youth she did not enjoy the privileges and advantages that the majority of young women have enjoyed. She married when she was 16 years of age. One child was born to this union. She was divorced when she was 18 years of age. She now has the custody of that child. In the latter part of October 1943, she met Donald Brennan and was married to him on November 23, 1943, at Oberlin, Kansas. He is the father of Delores Jeanne Brennan who was born on February 22, 1945, the minor child in controversy in this case. He was at that time in the Navy. They went to Virginia to live. She returned to North Platte in May 1944. She stayed with her mother for awhile, and later her parents purchased some furniture for her and she obtained an apartment and lived there with her sister. She received an allotment from her

husband in the amount of $50 a month which enabled them to get along.

In November 1945, Brennan returned on a furlough. Trouble developed between them and as a result he was arrested, fined, and released. Before he left, she believed that they had adjusted their affairs. However, after Brennan left it was his intention never to live with her again, but not to desert his minor child. The appellee believed he could not write to her but would return home. On July 16, 1946, when the baby was 14 months old, the appellee took the baby to Wellfleet where Donald's mother resided. She awaited his return. He was discharged from the Navy in July 1946. His barracks bag was returned, but he did not come back. His allotment to her ceased. She left the child with its grandmother in July 1946, concluding that she would have to obtain employment, which she did at a hotel in North Platte in the capacity of chamber maid and elevator girl. While so employed she visited the child every week or two when she could obtain leave. She worked in this capacity until May 1947. She obtained a leave of absence in October 1946, and went to Los Angeles for the purpose of locating her husband. She contacted his father there, and he informed her that he had not heard from Donald for a period of a year. Upon her return, and while visiting in Grand Island, she became acquainted with Sergeant Barnes. In a month or a little more he went to Alaska. She corresponded with him. He returned in 1947. They had fallen in love and were going together, and wanted to get married.

In May 1947, the plaintiff, her sister, a friend of hers, her little boy, her father, and Barnes went to see the baby. They asked the grandmother if they could take the baby to the lake and take some pictures. The grandmother grabbed the baby away from her and said she was never going to take her out of the house. David Brennan, her brother-in-law, said that as long as the baby was kept there, the appellee would not get her

hands on the baby, and told her to get off the place and never come back.

The grandmother's version of this affair is in subtance as follows: The appellee, her sister, a girl friend from North Platte, a soldier, and her father came to the grandmother's home. The appellee and the girls came into the house. The girls' language was not good, and her son David told them to go outside. He did not say that Delores could not come in, but said if they wanted to go to the car and have the men come in that would be all right. The men came in, and the appellee stayed about 10 minutes. The grandmother's reason for not letting the child go to the lake was because she did not like the language used by the girls, and did not believe it would be proper.

After that time the appellee did not visit the child again in the home, but on occasions would drive to Wellfleet and observe the child for a few minutes when she came out to play in the yard. She made no contribution in money to the child, but would take shoes and clothing. She also sent gifts to her father to be delivered to the grandmother, which were refused. She was not aware that her husband was contributing to his mother for the welfare of the child during that time.

The appellee testified that when the child was turned over to the grandmother it was in good health, had been checked by a pediatrician once in each 6 weeks, and that its diet required the use of syrup. At the time she left the child with the grandmother it was not her intention to relinquish its custody. However, at the time it was a more or less permanent custody for the reason that she had to obtain employment, and had no place to leave the child. She asked the defendant if she would watch over the child, and she replied: "That's what a grandmother is for."

The grandmother's testimony was that the child was in a sickly condition, afflicted with bowel trouble. She nursed it by keeping it clean and providing the proper

food for it until it regained its health. She had never seen the appellee until such time as her son Donald and the appellee came to her home when they were to be married.

The appellee went through three marriage ceremonies with Sergeant Barnes; the first one in Kelso, Washington, in January 1948; the second one in Vancouver, Washington, in April 1950; and the third one in Hot Springs, South Dakota, in August 1951. They have lived in Rapid City most of the time, where Barnes is stationed.

In July 1949, the appellee went to Broken Bow and instituted divorce proceedings against Brennan. She remained there until after she had obtained her divorce on February 7, 1950, and then returned to Rapid City. In April 1950, she went to Wellfleet to inform the grandmother that her attorney had said that she was entitled to the child. She attempted to obtain the child by physical force. The grandmother told her that she would take the child "over her dead body." The appellee was pulling on the child, and the child was pulling away. The grandmother struck the appellee on the head with a piece of pipe.

The grandmother's version of this affair is in substance as follows: In April 1950, the appellee and two men came to the house. She brought one man into the house and introduced him as her attorney. The appellee started to take the little girl outdoors. The little girl was pulling back, and the grandmother told the appellee: "Don't take her out that way." The appellee told this man, "Grab her hands and hold her." He tried to hold the grandmother and she hit his leg with a piece of tubing picked up from the porch. They were trying to take the little girl by force and she objected to it. They finally left. The grandmother heard nothing further about the matter until these proceedings were started.

Technical Sergeant Charlie Barnes testified that he was central fire-control gunner on a B-36, connected with the Strategic Recon Squadron, 28th Recon Wing;

that he had been connected with the armed services for a period of almost 11 years and intended to stay until he retired; and that his salary was $300 a month plus quarters, and in addition, flight pay of approximately $300 a month, together with $30 a month for ration allowance.

The appellee testified that the house they live in is practically new, about 3 years old. It consists of five rooms and bath. Facilities for washing are in the basement. It is close to the commissary and comfortable. There are two bedrooms, a living room, kitchen, and dining room, with steam heat, and it is entirely modern. It is close to the school. There is an eight-grade school, and there are government busses to Rapid City, a distance of 9 miles, for older children who attend high school. A new school is under construction on the base, and there are many facilities on the base for boys' and girls' recreation. The appellee further testified that she attends the Christian church at Rapid City; that her little boy attends Sunday school and belongs to the cub group of the church; and that her husband is sober, industrious, and faithful to his duties. She believed her marriage to be permanent.

Sergeant Barnes further testified that their utilities, electricity and water, are furnished free, and that the home is serviced with electrical appliances, stove, etc.; that he and his wife had talked about the custody of the little girl; that he would like nothing better than to have the little girl; that his wife arises at 6 o'clock in the morning, feeds the little boy, prepares him to go to school, and remains constantly throughout the day attending to her household duties; that he attends church with his wife; that he owns a 1950 Oldsmobile car and the furniture in the home, except the stove; and that he believes his marriage is a successful one. It is apparent that by this time a child has been born to this union. The sergeant is 28 years of age, as is also the appellee.

There are no other children in the family, and he has no other dependents.

The appellee testified also that the grandmother kept a neat and clean house and took good care of Delores Jeanne.

The owner of the Park Motel where the appellee stayed in North Platte testified that the appellee was well mannered, as was the little boy; that he was kept immaculate; and that she believed the little girl would have a good home with its mother.

The appellant testified that she was 48 years of age and had lived in Wellfleet for 20 years; that she was formerly married to Mr. Brennan; that two boys were born to this union, Donald, the father of the child in controversy being the older, the other is now in the United States Navy; and that both boys were in the Reserves and had been called back to the Navy. She and Mr. Brennan were divorced in 1929, and she married Mr. Morash, who was a paperhanger and painter. He died in September 1939. Two boys were born to this union, who were still at home. These boys have worked on a ranch and on a farm where they stayed on occasions and would come home on occasions. She further testified that when Mr. Morash was ill she was required to seek aid, and after his death she had aid for her sons; and that she owned a five-room house in Wellfleet. She did not know its age, but another witness testified it was about 35 years since it had been built. She testified as to the earnings of the boys and as to the school in Wellfleet which goes to the eighth grade. The high school is at Maywood, about 16 miles distant. During the time Donald was out of service he was employed by an aircraft factory. Her income is based upon what the boys give her. She was able to support herself and work. She further testified that the child in controversy knew no other home than hers, and that she loved the child and desired its custody. She did not believe that she had struck the appellee

in April when she came to obtain the custody of the little girl. She was informed by the county attorney that the divorce from her son was illegal and that the appellee had no right to the child.

The father, Donald Brennan, was stationed at Okinawa in the Navy. He returned for the purpose of being present at the hearing. He is 28 years old, and was on emergency leave. His status is a first-class aircraft electrician. He was released from the Navy first on July 29, 1946. He knew that his mother had the custody of the child. He provided $50 a month for support, which he believed was adequate, and on holidays gave extra money. He and his three brothers were able to support their mother. He is engaged in buying a home in Los Angeles on a contract upon which he had paid $3,000, and hoped to have his mother and brothers with him. When he returned to service after his leave in 1945, he did not intend to carry out his marriage with the appellee. He sent an allotment to her until he was released from the Navy. His mother, his brothers, and his father knew where he was at all times except perhaps for an interval of a week or so between letters. He saw his little girl in 1948 when he visited with his mother, and stayed with her for about a year until February 1949. He indicated that he knew the appellee was attempting to get the little girl, and testified that his mother was a fit and proper person to care for her and had done well, and that he did not send the appellee money, he did not believe it was necessary. He related the base pay he received and the flight pay, and stated that he was due for discharge on April 11, of the coming year. He further testified that he would have employment with good wages upon his release from the service, and that he had previously worked in the aircraft factory for $100 a week, until he was recalled by the Navy.

There is also testimony of a Methodist minister, of friends of the appellant, and of a social worker to the

effect that the appellant maintained a clean home, was a good housekeeper, was always busy, was active in church work, and that the child was a regular attendant at Sunday school, was a bright child, and now attended the grade school in Wellfleet.

The facilities of the appellant's home are not comparable to that of the appellee's home. There is nothing in the record, and as the trial court found, that would in any way indicate but that the appellant has taken good care of the child in controversy and provided for her to the best of her means.

It is apparent from an analysis of the evidence that the trial court believed that for the best interests of the child, the custody should be given to its mother, and that the mother and present husband had adequate facilities and means for its religious and educational training, substantial in character, and recognized that the evidence did not show that the mother was not a fit or proper person to have the care, control, and custody of her minor child.

In this connection, this court has held: "The natural rights of the parents are of important consideration and, in the absence of special circumstances, the child or children should be awarded to the parent, or parents, as against more distant relatives or third persons." Hanson v. Hanson, *supra*.

The custody of a child of tender years should be awarded the mother, unless it is shown that she is unsuitable or unfit to have such custody, or through some peculiar circumstance is unable to furnish a good home. See Hanson v Hanson, *supra*. See, also, Voboril v. Voboril, 115 Neb. 615, 214 N. W. 254; Norval v. Zinsmaster, *supra;* Bath v. Bath, 150 Neb. 591, 35 N. W. 2d 509; Meredith v. Meredith, 148 Neb. 845, 29 N. W. 2d 643; Hodges v. Hodges, 154 Neb. 178, 47 N. W. 2d 361.

While some claim is made that the appellee, in effect, abandoned Delores Jeanne and relinquished the custody of her to the appellant, there is no competent evidence

to sustain such claim. The appellant's contention is that the child remained with her from July 1946, to April 1950, without any claim being made for its custody until April 1950, and this constituted an abandonment and relinquishment of the custody of the child. In this respect we believe the following authorities applicable.

The right of a mother to the custody of her child is not lost beyond recall by an act of relinquishment, if such be the fact, performed under circumstances of temporary distress or discouragement.. See, State ex rel. Britton v. Bryant, *supra;* Norval v. Zinsmaster, *supra.*

In any event, if there was an agreement which purported to amount to the relinquishment of the child, such, of course, would always be subject to the best interests of the child and never be enforced to the sacrifice of its interests. See, State ex rel. Thompson v. Porter, *supra;* Norval v. Zinsmaster, *supra.*

Where the evidence on material questions of fact in a case such as the instant case is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite. See Lichtenberg v. Lichtenberg, 154 Neb. 278, 47 N. W. 2d 575.

From an analysis of the evidence we conclude that the judgment of the trial court should be affirmed.

AFFIRMED.