## IN RE HARRY W. BURDICK.

FILED JUNE 12, 1912.   No. 17,064.

Parent and Child: CUSTODY OF CHILD. Where a mother dies immediately after the birth of a child, and the father commits it to the custody of a competent woman who' properly cares for it in a suitable home without compensation, and the father permits a mutual attachment to grow up between them for a number of years under a contract with him awarding to her its permanent custody, in a proceeding by the father to regain his child, the general rule, that the controlling consideration is the child's own best interests, applies.

APPEAL from the district court for Custer county: BRUNO O. HOSTETLER, JUDGE. *Reversed with directions.*

*Sullivan & Squires*, for appellants.

*Silas A. Holcomb* and *A. P. Johnson, contra.*

ROSE, J.

This is a controversy over the custody of a child named Bertha Mildred Burdick. It was born November 13, 1906, and its mother died five days later. Before it was a week old it was taken to the home of Bert Kaelin, where it remained for more than three years. Kaelin's family consisted of himself, his wife, and two children—a boy ten years old and a girl of the age of six. May 14, 1910, Harry W. Burdick, the father of the child, petitioned the county court of Custer county for a writ of habeas corpus to obtain its custody, alleging that it was unlawfully deprived of its liberty by the Kaelins. At that time Burdick's family consisted of himself, a second wife, and a little son by his first wife. The rival families are prosperous farmers, living in commodious homes three-fourths of a mile apart, in Custer county, near Ansley. The trial in the county court resulted in an order taking the child from the Kaelins and restoring it to its father. Upon a review of the proceedings in the district court the judgment of the county court was affirmed. The Kaelins have appealed to this court.

Is the judgment of the county court free from error? Did the best interests of the child, when all of the facts, circumstances and conditions disclosed by the evidence are considered, require the county court to take the child from the Kaelins and restore it to its father? These are the questions to be determined.

Both the father and the Kaelins are abundantly able to furnish the child a suitable home, to support it, to educate it, and to bestow upon it a bounty in the form of property or testamentary bequests. It cannot be determined, without disregarding the evidence, that the father is unfit to have the custody of his child. That Mrs. Kaelin

is a suitable person to raise it has been demonstrated by an actual test of motherly devotion and care above the criticism of the father himself. The decision must therefore be controlled by other considerations.

The father asserts his rights as the natural guardian of his offspring. He further urges that he has a suitable home; that he has remarried and can properly care for his child; that his present wife will give it the care of a mother; that, according to the expressed wish of the child's mother and his own desires, his two children should be raised and educated together; that for their own good they should be companions; that the ties between brother and sister will be a benefit to both, if they are permitted to live together; that the control of a father is the best assurance of the child's welfare and happiness; that the Kaelins obtained only temporary custody of the child, with the understanding they should receive compensation, which he is willing to pay; that, for the purpose of preventing his own relatives from interfering with its custody, he entered into a contract allowing Mrs. Kaelin to keep it, but not for the purpose of abandoning his own rights as parent; that the contract was void as to him, and that the best interests of the child demand that it be restored to his custody and control.

The merit of these propositions cannot be determined without a full consideration of other facts. In a controversy like this the court is not bound as a matter of law to restore the child to its father. The welfare of an infant is paramount to the wishes of the parent, where it has formed a proper and natural attachment for another person who has long stood in the relation of a parent with the parent's consent. *Sturtevant v. State,* 15 Neb. 459; *Norval v. Zinsmaster,* 57 Neb. 158; *State v. Porter,* 78 Neb. 811.

Before and after the death of the mother, Mrs. Kaelin was at her home to minister to her and to her child without compensation. At the request of its father she took the child and its little brother home with her, and for a

44

short time kept an account of her expenditures in behalf of the baby. The little boy returned to his father in three weeks, but went back at intervals, remaining for a short time only. The child was sickly, and for three months it took practically all of Mrs. Kaelin's time. Like an anxious and devoted mother she spent entire nights with it without sleep. One night, when it was sick, she telephoned for its father, and he came to see it. Afterwards she again telephoned for him in the night, but he declined to come, saying she knew better than he what to do. Constant attention to the helpless, innocent child produced the natural result. There soon came a time when she recognized a growing attachment for it and when she began to dread a separation. After considerable discussion, the following contract in writing was duly executed: "This agreement made and entered into this 16th day of March, A. D. 1907, by and between Harry W. Burdick of the first part and Blanche Kaelin of the second part, witnesseth: That Harry W. Burdick of the first part is the father of Bertha Mildred Burdick, his minor child; and that said Harry W. Burdick has this day voluntarily relinquished all his right to the custody of and control over said Bertha Mildred Burdick, and to the services and wages of said child; to the end that said Bertha Mildred Burdick should be adopted by Blanche Kaelin, and that said Blanche Kaelin shall bestow upon said Bertha Mildred Burdick all the care of and control over, as should be bestowed upon a child born in lawful wedlock. It is further agreed that the first party shall, at all reasonable times, be permitted to visit said Bertha Mildred Burdick and to have said Bertha Mildred Burdick visit him, if she so chooses. It is further agreed that, should the second party not provide the proper care of said child, then the said Harry W. Burdick shall have full right to take said child and declare this contract null and void. Harry W. Burdick, Blanche Kaelin. Witness: C. Mackey."

Consent to the adoption was withdrawn. Of course, a

father, by entering into a contract of this kind, cannot escape his obligations to his offspring; nor can such an instrument be made the means of keeping a child in an unsuitable place, where a proper one is available. An examination of the opinions discussing this subject shows the correctness of the following editorial note found in *State v. Steel*, 16 L. R. A. n. s. 1004 (121 La. 215, 46 So. 215): "Though it is quite generally held that a contract whereby a parent intrusts to another the custody of his child, with the understanding that his rights thereto as parent are thereby transferred, is against public policy and unenforceable, yet, the cases are numerous where the court is at great pains to discover whether or not such an agreement has been made. To such a contract great importance is attached; and oftentimes, especially where both claimants for the child are equally fit, such contract is the deciding factor."

Though Burdick insists that the contract was made to protect the child's custody from the interference of his relatives, his own testimony shows that every time he thereafter mentioned the subject to Mrs. Kaelin she asserted her absolute right of control, and that her will in that respect prevailed. She kept the child three years after he remarried. She and her husband have defended their possession in three courts with a vigor which could not be surpassed on behalf of their own children. When Burdick spoke to Mrs. Kaelin about paying for keeping the child, she resented it, saying she could not be compensated in money. He never in fact gave or paid her anything of value beyond $18—an insufficient reward for taking care of his little boy alone, though she made no charge for doing so. No disinterested person can read the record without being convinced that she believed in her right of custody under her contract. After the agreement was executed she allowed the child to pull at her heart-strings, and she reciprocated without restraint. She testified without qualification that her attachment for the child was the same as for her own children. When the writ was served

upon her, all the child knew of home and mother had been learned at the Kaelins, where it was happy and contented. Such ties cannot be severed without affecting the child. Did its best interests require a separation? Mrs. Kaelin has children of her own. Her spirit has been refined in the crucible of motherhood. She has been a teacher. In her home the child hears language and observes manners born of culture and refinement, where there are pictures, flowers and music. There it is under moral and religious influences softened by liberality and freedom. A court may well hesitate to take a child away from such surroundings to try an experiment elsewhere. It is no disparagement to the stepmother to say that these conditions cannot be equaled in her home. Upon a few days' acquaintance she was married to the father of the child six months after the death of its mother. She is ten years older than her husband, has no children of her own, and has passed the time of life when she can hope to become a mother. At the trial she made no claim to an affection for the child beyond that imposed by her duties as a stepmother. These facts are not mentioned as reflections upon her fitness to have the custody of the child, but to suggest the difference in conditions to which a change of custody would subject it. Mrs. Burdick has a large, well-kept house, near a good school, and her testimony indicates that she would require strict observance of moral and religious principles as she understands them.

At the time of the trial the child's happiness and welfare were assured, for the present at least. To make a change would be an experiment at best. At the Kaelins the father will not be deprived of the companionship of his daughter, but will be welcomed there as a visitor at all proper times, as long as he recognizes their right of custody. Upon a proper consideration of the entire case, it cannot be held that the best interests of the child require a change in its custody. It follows that there was error in the order affirming the judgment of the county court. The affirmance is therefore reversed and the cause re-

manded to the district court, with instructions to commit the custody of the child to Mrs. Kaelin.

REVERSED.