ANNA BECKWOLD LARSON, Appellant, v. FRANK DUTTON and Mrs. Frank Dutton, Respondents.

(172 N. W. 869.)

**Habeas corpus — custody of child — best interests of child.**

1. In determining the custody of a child, the paramount consideration is the child's welfare.

**Habeas corpus — appeal — trial de novo.**

2. A habeas corpus proceeding is not triable anew in this court.

**Habeas corpus — findings based on parol evidence.**

3. Where the findings in a habeas corpus proceeding are based upon parol evidence, they will not be disturbed unless they are shown to be clearly wrong.

Opinion filed May 27, 1919.

From a judgment of the District Court of Burleigh County, *Nuessle,* J., plaintiff appeals.

Affirmed.

---

NOTE.—On denial of custody of child to parent for its well-being, see note in 41 L.R.A. (N.S.) 564, where it appears that the rule that obtains in most courts at the present day is that the welfare of the child is to be regarded more than the technical rights of the parents. So that, following this rule, it is held that the child will not be delivered to the custody of either parent where it is not for the best interest of the child.

*Wade A. Beardsley* and *E. T. Burke,* for appellant.
*Newton, Dullam, & Young,* for respondents.

CHRISTIANSON, Ch. J.   This is a habeas corpus proceeding, instituted by the petitioner in the district court of Burleigh county to recover the custody of her infant daughter.   The trial court made findings adverse to the petitioner, and she has appealed from the judgment quashing the writ.

The testimony of the petitioner shows that while she was working in Christiania, Norway, she became acquainted with one Bjorne Larson. He was a machinist on an ocean steamer.   Having made a contract to perform some work in China, he went to Germany in the early part of February, 1914, for the purpose of embarking for China.   The petitioner, who at that time was between nineteen and twenty years of age, went with him.   They stayed at a hotel in Germany for a day and a night, whereupon he embarked for China, and she went back to Norway, Some four months later she consulted a physician, and was informed that she was pregnant.   She thereupon decided to come to this country. She says she wanted to leave Norway because she "wouldn't have her family shamed (disgraced)."   She did not tell her folks anything about her pregnancy.   The petitioner and Bjorne Larson were not engaged at the time the child was begotten.   She says they had never talked about marriage.   The petitioner arrived in this country on July 23, 1914. She went to the home of a friend in South Dakota, where she stayed for about one week.   She then obtained employment with one Mrs. Shade, where she remained until about the middle of September, 1914, at which time she left and came to Buffalo, North Dakota, where her cousin was working as a domestic in the home of one More, a lawyer and banker at that place.   The petitioner, shortly after her arrival in Buffalo, went to More's home, where she remained until some time in October, when she was taken to Mrs. Camp's private maternity hospital in Fargo.   On November 1, 1914, she gave birth to the child whose custody is involved in this proceeding.   She remained in the maternity hospital until November 24, 1914.   On that day she went back to More's home at Buffalo, where she remained until December 25, 1914.   The day before she left the hospital, she executed a written instrument which in terms provided that she relinquished all rights to the child to ———,

and that they were to provide the child with a proper home and care, and to maintain and educate it. The name of the party to whom the child was to be delivered was left blank, and the names of the respondents were subsequently inserted by Mrs. Camp.

The petitioner admits that she executed the instrument. She also admits that she was not forced to sign it, and she denies, apparently with some indignation, any intention to assert that More deceived her with respect to the contents or effect of the instrument. She says: "He tried to explain. He said something to my cousin and she said it to me, but I didn't understand then what it meant." She admits, however, that she knew that it related to her child, and "had something to do about giving [her] child away."

During an examination of the petitioner conducted by the court, the following questions were asked and answers given thereto:

Q. Did you think that you couldn't take the baby around and do housework?

A. Yes, my cousin told me I couldn't get any place with the baby.

Q. You had thought about that?

A. Yes.

Q. So you didn't know just what to do at that time?

A. No, because I thought I had to save the baby's life anyway.

Q. Your cousin told you then (November 24, 1914) that you had to make some arrangements about the baby?

A. Yes.

Q. Had you made up your mind then to let the baby go?

A. Yes, to folks who would be good to her.

Q. That is when you signed the paper?

A. Yes.

Q. So, then, you really knew, at the time you signed this paper, that the baby was going to be put out in some family where they would be good to her?

A. Yes.

The following question was propounded, and answer given during petitioner's redirect examination:

Q. While you were at Mrs Camp's was there any talk of your letting this child go to any other place than with Mrs. Camp?

A. Yes, I heard them mention Davis.

The petitioner, however, claims that she did not know that she was "giving the child away for all time," and says that she supposed she would get it back at some future time, "because in Norway they never adopt a baby,—they just take care of it." She says, however, that no promises were made to her that the child would be returned to her in the future.

Petitioner says that on the day following the execution of the instrument, before leaving for Buffalo, Mrs. Camp told her that she "had no right to the child any more." Petitioner identified, and there was offered in evidence, a letter from Mrs. Camp, dated December 13, 1914. In this letter Mrs. Camp informed her that the little girl had gone to a very nice home, and that the people who had her loved her very much, and that before taking her away from Fargo, they had purchased many nice clothes for her. Mrs. Camp also inclosed a letter which she had received from the respondent, Mrs. Dutton. In this letter Mrs. Dutton tells how much they enjoy the baby, and how she is growing. She says: "My husband thinks it the only baby ever, and we are so happy with it. Wish you would send paper, as we want to get it baptized just as soon as we can. Inclosed find notice which was in the paper." The notice referred to was also sent to the petitioner with the letter. It was a clipping from the Wilton newspaper, mentioning the arrival of a little girl at the Dutton home. It was so phrased as to indicate that the child was the natural child of the Duttons. (Mrs. Camp had clipped Mrs. Dutton's signature from the letter, and also erased from the newspaper clipping something which indicated where the paper was printed.) At the time the petitioner received this letter she was with her cousin in the More home at Buffalo.

According to petitioner's testimony she did not notify the child's father of her trouble until after the child had been born. He then sent her $70, which she received in the January following. She also says that he later sent her various amounts aggregating in all $500. All of petitioner's expenses at the maternity hospital were paid by More as an act of charity, and he also in addition thereto paid petitioner wages during the time she was at his home. Neither petitioner nor her husband are citizens of this country or residents of this state, and they have no property in this country, although she says they have about $300 in money here, and that her husband has some money in Norway. At the

time of the trial she was, and since her arrival in Wilton in May, 1917, had been, working in a hotel there, and her husband was working in the harvest fields near Wilton and they had no established home anywhere. She testified that her husband had been earning 270 Mexican dollars a month while he was working as a machinist in China.

When the petitioner left More's home on December 25, 1914, she went to visit a cousin who lived at Clearbrook, Minnesota. She remained with this cousin until April, 1915, when she went to Minneapolis. She worked in Minneapolis for about three months, and then went to South Dakota, and worked for Mrs. Shade until Christmas, 1915. She then went to Minneapolis, and worked for the Northwestern Knitting Company until April, 1916, when she returned to Mrs. Shade and worked for her until in August, 1916. At this time she returned to Minneapolis, and had an operation performed, later she went to work for the Northwestern Knitting Company, where she worked until the beginning of April, 1917. At this time she came to Buffalo, North Dakota, and remained there for about a month visiting with her cousin and with Mrs. More. In the beginning of May, 1917, she left Buffalo, and came to Wilton, North Dakota, where the child was then and still is living with the respondents in this case. She commenced this proceeding on May 18, 1917. In July, 1917, she married Bjorne Larson, the child's father. The testimony of the petitioner does not indicate that she made any particular effort to locate her child until in the winter or spring of 1917, and it seems rather a reasonable deduction that in the meantime she and Bjorne Larson had agreed upon marriage. At the time the petitioner left the child at the maternity hospital she had no expectation of such marriage, and when her testimony is considered in light of all the circumstances it seems extremely doubtful that she then had any intention of ever claiming the child at any time in the future. Such intention seems to have been formed only after the marriage between herself and Bjorne Larson had been arranged for. The petitioner's husband, Bjorne Larson, did not testify at all, although he was present at the trial.

Both respondents testified. They reside at Wilton, where Mr. Dutton is working for the Washburn Lignite Coal Company. He is a "cutter" in the coal mines of the company. He has been so employed for over sixteen years, and is receiving a wage of from $150 to $225 per month. The respondents have been married about fifteen years, and have lived

at Wilton all of their married life. Their marriage has been childless. They were desirous of adopting a child, and had made inquiries from the superintendent of the North Dakota Children's Home at Fargo, and through him they were put in touch with Mrs. Camp, with the result that Mrs. Dutton received the little girl from Mrs. Camp on the 28th or 29th day of November, 1914. At the time she weighed only 6 pounds and was ruptured. The respondents desired to adopt her, and were under the impression that the instrument which they had received —which had been executed and acknowledged by the mother—accomplished a legal adoption. It was only after the petitioner claimed the child that they ascertained that this was not so, and upon the hearing before the district judge both respondents declared their desire and willingness to legally adopt the child. No one can read the testimony of the respondents without being impressed with their apparent candor and good faith, and convinced of their intense affection for the child.

Many residents of Wilton were called as witnesses by both sides. They all agree that the respondents have always manifested a great deal of affection for the child, and she for them. No one denied that they had given, and were giving, her a good home. Even the petitioner said that she "thinks Mrs. Dutton treats the baby nicely," but that she thinks "she doesn't know how to take care of it right." She admits that the baby is "healthy and well" now, and says she thinks Mrs. Dutton cares for it, and that Mr. Dutton "cares a whole lot." The evidence shows that the child upon two occasions was quite ill. During those illnesses the Duttons procured for her the very best of medical care, and upon one occasion a trained nurse. The child was also ill after the petitioner came to Wilton, and Mrs. Dutton then sent word to her that the baby was not expected to live; but the petitioner did not go and see the baby, and upon the trial she gave no explanation for her failure to do so. During the time that petitioner has lived in Wilton she has not gone near or even spoken to the respondents.

It is truly unfortunate that controversies like this should ever arise. Manifestly any decision rendered will cause pain and heartache to someone. On the one side we have the mother, claiming her child. On the other hand we have those who have been the only mother and father the little one has ever known. They received her with the intention that she should thenceforth become and be known as their daughter. And

as a daughter they have treated her. They are not rich in this world's goods, but they have gladly borne every expense necessary for the child's welfare and comfort. When they received her she was a small, sickly baby, and through their care she has become "healthy and well." They sat beside her sick bed, and "watched her breathing through the night, her breathing soft and low, as in her breast the wave of life kept heaving to and fro." They saw her first smile and received her first caresses. She occupies a place in their home and in their hearts which nothing else can fill, and they have become bound to her with ties which no earthly decree can sever.

It has been suggested with much force that if persons who receive and adopt children from a children's home or similar institution, and keep and care for them for years until strong ties of attachment are formed, may be deprived of them because the natural parent changes his mind, then no one would dare to adopt such children, and as a result they would be denied homes, and might even lose their lives for want of proper care. The legal rights of the contending parties, however, are not of controlling importance. The question of the custody of the child "is dealt with as one of discretion, to be exerciesd on equitable principles, rather than one of strict right, in whatever forum it arises." And in a case like this, where the natural parent has in effect abandoned all dominion over a child, and it has been taken into the home of others, who have received and treated it as their own, the fact that the child has not been legally adopted by the latter is by no means decisive of the right of custody. For even the legal dominion which the law gives to the natural parent has its limitations. Such dominion is in the nature of a sacred trust which the law imposes upon the parent for the benefit of the child. Nugent v. Powell, 4 Wyo. 173, 20 L.R.A. 199, 62 Am. St. Rep. 17, 33 Pac. 23. As long as the parent is true to such trust the right to the custody and control of his or her child is paramount, but when the parent fails to perform the duties which the trust implies, the parent forfeits the legal dominion over the child as a matter of absolute right; and such dominion will not be enforced by the courts if the court deems it to be contrary to the best interests of the child. In controversies like the one involved in this case the paramount question is, What is for the best welfare of the child? and it is the duty of the court "to leave the child where its interests will be best subserved." Re Sidle,

31 N. D. 405, 154 N. W. 277; Re Hickey, 85 Kan. 556, 41 L.R.A. (N.S.) 564, 118 Pac. 56; Re Burdick, 91 Neb. 639, 40 L.R.A.(N.S.) 887, 136 N. W. 988.

During the course of the trial the trial court expressly announced that he deemed the child's welfare to be the determinative factor in the case. And with this in view he refused to compel a change of custody. We have already referred to the evidence adduced upon the trial. Of course we have merely the written record before us. The trial judge had the parties as well as the child in flesh and blood. He heard the stories of the parties, and saw their demeanor and conduct. Obviously he was in far better position to pass upon the questions involved than are the members of this court. And even though the case was triable anew in this court, we would hesitate to overturn the findings of the trial judge under these circumstances. In fact, it seems to be a rule of general application that in cases of this kind the trial court is deemed to be vested with a wide discretion. 21 Cyc. 34, note 69. But while appellant has demanded a trial *de novo* in this court, we are satisfied we have no authority to grant such demand, for the authority of this court to try cases anew is derived solely from the statute. Littel v. Phinney, 10 N. D. 351, 87 N. W. 593. And the statute does not authorize a trial *de novo* of a special proceeding. State ex rel. Bickford v. Fabrick, 16 N. D. 94, 112 N. W. 74. Inasmuch as this is a special proceeding, this court has no power to try the case anew, but is limited to a review of errors. And "the case comes to us with the presumption in favor of the legality and correctness of the findings. Appellant must establish error, and where a finding is based upon parol evidence, its error must clearly and unquestionably appear, or it will not be disturbed." Jasper v. Hazen, 4 N. D. 1, 23 L.R.A. 58, 58 N. W. 454; 21 Cyc. 346.

The record shows that the trial was conducted with extreme fairness. The district judge, who looked into the faces of the parties and their witnesses, and heard their stories as they fell from the lips, concluded that the welfare of the child would be best subserved by leaving the child with the respondents. There is nothing in the record before us to justify this court in interfering with that conclusion.

Judgment affirmed.

GRACE, J. From the result at which the majority opinion has arrived, I respectfully dissent.

ROBINSON, J. (concurring specially). Four years ago at the maternity hospital in Fargo a poor young woman found herself the mother of an infant for which she had no father. It weighed 4 pounds. The mother being destitute and having to earn her own living by working as a domestic, she arranged with the matron of the hospital to find some good family to adopt the infant. A good motherly woman was found, who went from Wilton to Fargo, took the infant of two months, cuddled it to her bosom as her own child, and returned with it to her good home in Wilton. The foster mother being childless, the infant at once became the pet and idol of herself and her husband, and, under the best of care and nursing, it grew to be a bright and beauteous and happy child. Of course it was with grief and tears that the natural mother gave away her infant and signed a paper releasing her claim to it, but she did it for the good of the infant and to preserve its life because she was unable to care for it.

Now she has married the father of the child and lives with him somewhere in Idaho, and another infant has come to her, and now she asks to regain the first child and to carry it out of the state and beyond the jurisdiction of the court, and to rend the ties of love and affection which bind the little girl to the mother who has preserved its life. There is nothing to show that the plaintiff has any means or any home, or that she is prepared to give the child the care and comforts to which she has been accustomed. There is a showing of poverty and improvidence which indicates that an exchange of homes and a transportation to Idaho would bode ill for the child. Two years ago, when this action was commenced, the plaintiff and her husband had no home. She was a domestic; he a hired man. At present they may have a homestead with a little shack on the plains in some valley in Idaho.

The primary and controlling question is the welfare of *society* and the welfare of the child. She is not a chattel to which any party can assert a legal title, *and the superior right is with the mother who has preserved the life of the child, and not with her who abandoned it*. Yet, strange to say, on this question the judges are divided and they talk of common law and legal rights and the scrap of paper which the mother gave with her infant to show that she released and abandoned it. And it is true the scrap of paper is but a link in the chain of evidence showing how the mother gave away and abandoned her infant the same as if

she had wrapped it in a basket and left it at the door of some house. One judge says there is no common-law adoption; says there can be no adoption of a child unless in the manner provided by statute; but children were adopted long before people knew anything of laws and statutes. In the legends of ancient Rome we read how a good motherly wolf adopted and nursed Romulus and Remus and how the boys grew up and always loved and cherished their wolf mother. The law of natural adoption has always prevailed among the human species and among the inferior animals, and it has saved millions of helpless infants. If we repeal the law of natural adoption by deciding that a motherly woman cannot safely adopt an abandoned infant, then we doom such infants to perish by neglect, because the motherly instinct will not impel a woman to adopt an infant waif and to cherish it as her own if she knows that the law may rend her heart and her dearest affections by tearing the child away from her. I cannot well imagine a scene more tearful and distressing than the tearing apart the little happy child and her foster mother. How can such tearing be voted for by any judge who has at heart the welfare of the child and the welfare of humanity and of other children that may need a foster parent?

BRONSON, J. (I dissent). I agree with neither the result nor the principle of law applied in this case. It is deemed unnecessary to review or restate the facts otherwise than as stated in the majority opinion. They have been stated rather favorably for the defendants, being drawn somewhat from the testimony adduced by the defendants. It is sufficient to state that no delinquencies are established or proved as against the natural parents which affect their right, legally, to the custody of their own child. The record fairly shows that both of the contesting parties are equally able and willing to give the child involved a suitable home and suitable care and attention. If any mistake was made by the plaintiff before marriage it is now rectified. The child is the legitimate child of the plaintiff and her husband. Comp. Laws 1913, § 4421. The child has not been adopted by the defendants and no proceedings have been taken by them so to do. Fairly, does the evidence show that this poor Norwegian girl, coming from a foreign country, neither understanding nor able to read or write English, without money and without friends, except charitable friends, while in a condition of distress, not

for her own sake, but for the sake of her child, and for the love that she bore for it, being informed, in a country strange to her, that she could not keep the child and take it with her, signed the written statement mentioned in the majority opinion. That she has ever been solicitous about and has had a real mother's love for the child is evidenced by her letter written to the maternity hospital soon after her departure therefrom, as well as by all her attempts afterwards to locate the child, and by this proceeding through which she seeks to gain the actual custody of the child. As a matter of law, at the present time, the natural parents of this child have imposed upon them the legal duty to maintain, care for, and educate such child. As a matter of law, as such natural parents they are entitled to the custody and control of such child. Comp. Laws 1913, § 4440. The defendants in this case have no such legal duty imposed upon them; they have no right, as a matter of law, to the custody or control of such child except such as this court, through its opinion, grants, by its fiat, under the doctrine that the welfare of the child is the paramount consideration.

In the abstract, the principle of law stated in the majority opinion, that "in determining the custody of the child the paramount consideration is the child's welfare," is founded neither upon good morals nor upon the best interests of civilization when it ignores the legal status and the legal considerations applicable to the child, upon the record, and the natural considerations of parental love and affection which in a measure is the backbone and basis of our civilization. Truly there is a place and there is a field for the application of this abstract principle of law. It does not mean, however, that in every case that the chancellor's foot should become the measuring stick by which the custody of a child should be torn and taken away from its natural parents and given to absolute strangers where the law has established no legal right in the strangers to such child, and has established no delinquency or disability of the natural parents to perform their parental duties. If such be the rule, well might the bright, intelligent child in the humblest home of poor, devoted parents be taken and given to the home, much better provided and with much greater facilities existing, owing to the prominence and wealth of the owners, but strangers to the child, when, in the viewpoint of the chancellor, the best welfare of the child as a future citizen of this state would be subserved. Such applications of equity do vio-

lence to the most tender feelings and sympathies that modern civiliza-. tion discloses, namely, to the natural love and affection of father and mother for their own child and to the assurance that modern society and civilization has given to them; the assurance that, no matter how humble their home may be, or how little of this world's possessions they may have, their child, begotten by them, shall remain with them unless by reason of their delinquency the law adjudicates them to be improper persons to longer continue their custody, and unless, further, the law determines that this parental love with which goes the performance of parental duties is absent. The majority opinion relies to a great extent upon the determination made by the trial court and upon the discretion exercised by the trial court. The record discloses that upon the facts, the controversy is not serious, the question is principally one of law. The trial court necessarily was guided by the broad principle of law stated in the case of Re Sidle, 31 N. D. 405, 154 N. W. 277. That case upon principles of right, and of justice, in accordance with the facts in that case, should be criticized, and expressly disapproved. It is to be noted that in the great majority of cases where the principle is applied that the welfare of the child is the paramount consideration, the relations generally concern the right of father and the right of the mother to the custody of the child, or the right of some immediate relative as against one of the parents in connection with divorce proceedings, or where actual delinquencies are shown on the part of the parents; or in cases where questions arise as between a guardian appointed by the court and the parents. The history of the law in American and English jurisprudence clearly demonstrates that, down through the centuries, the law has guarded zealously the right of the natural parents to the custody of their own children, in the interests of civilization as well as upon principles of right and equity. See 41 L.R.A.(N.S.) 570, and 20 Am. Dec. 330.

Even in the Sidle Case, supra, the contest arose between one claimed by legal adoption and therefore the legal guardian, as against the natural parents. Even in the Hickey Case (cited in the majority opinion) the mother, claiming the child as against the person having possession, was shown to be delinquent, she having remarried, or attempting so to do, while a divorce was pending against her husband, the natural father of the child. In Re Burdick, 91 Neb. 639, 40 L.R.A.(N.S.) 887, 136

N. W. 988, cited in the majority opinion, the natural mother died immediately after the birth of the child, and the father executed a written agreement relinquishing right to the custody and control of the child to a neighbor.   Thereafter he remarried and sought to regain the custody of the child.   Even in this case the situation can be readily distinguished from the case at bar, where both the natural father and the natural mother are seeking to secure the custody of their own child, where the record discloses lack of intent to permanently abandon the child by its mother or of any abandonment of the maternal love for such child.   In other words, the court should always give the custody of the child to the person having legal right thereto, and this legal right should not be interfered with unless the parents so conduct themselves as to render it essential to the safety and welfare of the child in some serious and important aspect either physically, intellectually, or morally, so that it should be removed from their custody.   29 Cyc. 1594.   See note in 4 A. R. C. 892.

The judgment, therefore, in any event should be reversed, either absolutely, or for purposes of a new trial to take additional testimony with respect to any existing legal reasons that might be adduced why the natural parents should not have the custody of their own child.