ALOIS F. KAUFMANN, APPELLEE, V. HENRY M. KAUFMANN
ET AL., APPELLANTS.

299 N. W. 617

FILED JULY 29, 1941. No. 31156.

*Leon, White & Lipp,* for appellants.

*John L. Chew* and *G. H. Seig, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

PAINE, J.

This was an action in habeas corpus, brought by Alois F. Kaufmann, petitioner and appellee, against Henry M. Kaufmann and Ella Mae Kaufmann, respondents and appellants, seeking the custody and possession of his minor child, Alois F. Kaufmann, Jr. By the judgment of the district court, the writ was granted, and the respondents were

ordered to deliver the child to petitioner, which order was complied with in open court. Trial court overruled the separate motions of respondents for a new trial. Prior to giving up the child in court, the respondents asked the court to fix a supersedeas bond in order that the child might remain in their custody pending appeal to the supreme court. This request was denied. Thereafter a motion was filed in the supreme court for a supersedeas bond to be fixed, so that pending final determination the child should be left in the custody of respondents. After argument, this court on January 20, 1941, fixed a supersedeas bond in the sum of $500, and ordered the child to be placed in the custody and possession of the respondents until the further order of this court. The supersedeas bond being filed, the child has remained in the custody of the respondents.

The petition alleged that Alois F. Kaufmann was the father of Alois F. Kaufmann, Jr., who was born September 22, 1938, and that respondents forcibly and unlawfully detain said child from its natural father, contrary to his wishes, without legal right or claim, and have repeatedly refused to give up the child on the request of the juvenile authorities of the district court for Douglas county, and prays that a writ of habeas corpus be granted, directing respondents to have the body of said child before the court at a time and place to be fixed, and to obey the further order of the court in said matter.

The answer of respondents, after denying generally the allegations of the petition, admitted that Alois F. Kaufmann, Jr., was in their custody and possession, and had been in their lawful and legal custody for more than 17 months last past; that when the child was but three months old he was in a poor physical condition, and suffering from rickets, an eye ailment, and physical infirmities, and from malnutrition, and that the petitioner at that time confessed and admitted his inability to properly care for and raise the child, and that he did then offer to turn over permanently the custody, care and possession of the child to the

respondents, in order that the respondents might raise the child, and that the petitioner did further offer to relinquish and abandon permanently any control over the care, custody and maintenance of the child; that pursuant to such representations and offers of the petitioner, and upon such conditions, the respondents did then take the child into their custody and home, and did continuously, since the date the child was turned over to them, care for, attend and rear the child in a careful, wholesome and loving manner, and in a manner having regard for the welfare and best interests of the child; that the respondents nursed the child, attended his needs and requirements, and employed expert medical care in his behalf, so that the child was in a safe, healthy and sound physical condition. The answer further alleges that the respondents have constantly maintained a good and moral home for the raising of the child, and do now assert that the petitioner was then, is now, and at all times has been without a home to raise the child, and has never manifested any interest in or disposition for the welfare of the child.

The respondents charge that the petitioner in effect abandoned said child, but through their efforts his life was saved, and he was prevented from being placed in a public institution.

The respondents further charge that the petitioner has at no time offered to contribute to the support of said child, and that the respondents have paid all of the expenses for rearing and maintaining said child, including all medical expenses.

The respondents declare that they own their own home, that the head of the home is gainfully employed at a respectable vocation, and that the respondents are members and regular attendants of a church, and intend to raise the child as a Christian, and will give the child a good education. The respondents further charge that the petitioner is without a home, that he is engaged in the vocation of a bartender, and does not keep regular hours, and frequently absents himself from his dwelling-place until 4 or 5 o'clock in the morning.

After the trial in the district court, a writ of habeas corpus was granted to the petitioner, and respondents were directed to deliver possession of the child forthwith.

Thirteen errors were alleged in the motion for new trial, some of which will be discussed later in this opinion.

Respondents, objecting to delivery of the child, petitioned for an order granting a supersedeas bond pending appeal and a stay of delivery of the child until the supreme court shall have had time to act in said matter, and this petition was denied.

Thereupon, præcipe was filed in this court on December 31, 1940, and on January 3, 1941, respondents filed motion asking this court to set a supersedeas bond and direct petitioner to deliver custody of the child to respondents pending final determination of the case. Accompanying this motion were many affidavits, and this court granted a supersedeas bond, and directed the child remain with respondents until the case was determined.

In a controversy of this kind, this court is not bound, as a matter of law, to restore the little child to its father. The welfare of the infant is paramount to the wishes of the father, or any other relatives. *In re Burdick*, 91 Neb. 639, 136 N. W. 988.

It is therefore necessary to present a summary of the evidence, as disclosed by a careful reading of the entire bill of exceptions, covering the evidence as taken on the many days of the trial, for it was continued from time to time. The trial began on June 20, 1940, and the evidence closed on August 14, 1940, upon which day the writ of habeas corpus was granted.

The petitioner testified that he was 32 years of age; that Alois F. Kaufmann, Jr., his child, about which this litigation has arisen, was born September 22, 1938, and that he separated from his first wife December 5, 1938, the mother leaving the child with him; that he moved out to the home of the respondents, taking some bedroom furniture out there, and that he had remained, living at the home of the respondents until June 12, 1940, which was eight days be-

fore the trial began, and that he is now in a position to give the child a home.

Petitioner testified that he is working at the Storz Tavern, located next to the Storz Brewery; that when working day-time his regular hours would be from 7:30 a. m. to 4:30 p. m., but that due to the sickness of the owner, Mr. Kenney, he has during the past year had to put in extra hours in the evening.

He testified that his sister-in-law, Ella Mae, took the child, but he never said he was going to turn it over to them; that they had never asked him to buy any clothes for the child, and therefore he had not bought any, but he had asked his sister-in-law lots of times how much the bill was for clothes and other things, and she always said, "That is all right, I will take care of them." He positively stated that it was never his intention to give up his baby permanently.

He testified that, when he married his present wife, she was working in Kansas City, but came up about every week-end to Omaha, and that she quit work and came back to Omaha just a week before the trial, and that she was going to quit working and take care of the baby; that just a week before the trial petitioner left the home of respondents and moved to 2574 Pinkney street, which is the home of his father-in-law, and that he moved his bedroom furniture to that place.

On cross-examination the petitioner testified that he came to this country in 1927, lived in Chicago eight years, and the last four years in Omaha. He admitted that he had been arrested once in Chicago ten years ago, when he went out one night to celebrate and wrote a couple of no-fund checks, which his brother made good, so he was not confined in jail except a couple of days. He admitted that the sister-in-law had a small bank for the baby, and that friends and relatives put money in there for the baby, but he had never put any in, but said he was saving some down at Storz Tavern for the baby.

Bruce Kenney testified that his father had just died on

June 15; that he and his father owned the Storz Tavern, where the petitioner worked; that they have liquor, the license being in his name, and run a restaurant; that 60 per cent. of their business is selling lunches and dinners; that it has no connection with the Storz Brewery; that his father was sick for a long time, and that the petitioner acted as manager of the business. Kenney said he was engaged in the advertising business, but usually stops in this tavern in the morning, and eats lunch there every day, to watch what is going on, and signs the social security report; that the tavern takes in about $100 a day on the average; that the tavern opens at 7 a. m., and the door is closed at 1 a. m., after which the place is cleaned up, and the money is counted, and a record made of the day's purchases. This requires the petitioner to work very late. He has always been paid $25 a week, but now that witness' father has died he would like to pay him $35 a week, because of his increased responsibilities. Witness testified that he had never known of the petitioner drinking, and he knows nothing derogatory to his character or reputation.

Adolph Storz testified that he was president of the Storz Brewing Company, and had known the petitioner for three or four years; that he usually ate his lunch at this Storz Tavern. He says that the petitioner is a very upright, honest man, and that he has never seen him take a drink.

Mrs. Alois F. Kaufmann, the second wife of petitioner, testified that she is 26 years of age; that she resided in Omaha, then moved to Kansas City, and before that had lived in Lincoln and Washington, D. C.; that she had done stenographic and secretarial work in the University of Nebraska and in civil service work; that in Washington she worked for the Rural Electrification Administration; that she lived in Washington, D. C., from March, 1938, until May, 1939; that she worked in Omaha from May until October, and then was transferred to Kansas City.

On cross-examination she admitted that she had written letters to Omaha several months before, trying to find other

jobs at Omaha in some one of the government agencies. She was asked whether she had changed her mind about seeking employment, and her answer was, "Yes, I think so," and had decided to go in for housekeeping, and would give up the idea of working. This plan of housekeeping and keeping up a home for her husband had been in force for a period of about a week before the trial. Witness testified that she had to keep on working because she had doctor bills that she had to pay for her operation the fall before. She said that she had seen the child once out at their home; that he was not quite a year old, but at that time she was not really thinking of getting married; that she had seen the child once since that time. She testified that she told her husband that she was willing to take the child; that last Christmas they bought a present for the child, that it was a little pull toy, but had never sent him any other presents, or any clothes.

Chris Kuhl testified that he was 57 years of age; and his wife was 56; that he was born in Germany, and had been here since 1904; that some years ago he worked for the Storz Brewing Company as credit manager, and private secretary to the aged president, Gottlieb Storz, for about two years; that he then worked in a tavern, and at present was working for the Metz Brewing Company; that they have only one child, a daughter, the present wife of the petitioner.

Witness testified that his daughter is a graduate of the state university, and since her graduation has been occupying civil service positions; that when his daughter returned from Kansas City a few days before the trial, she and the petitioner moved into his home, and that that is entirely agreeable, and that it will be perfectly satisfactory if they bring the child into his home. Witness testified that he became acquainted with petitioner when he was working for the Storz Brewing Company; that they are good friends; that his daughter married him with his consent, and that the petitioner is a very, very moderate drinker, and that he has "had personal occasion a good many times to observe

that he sometimes even hates to take a drink with a friend and customer."

Witness testified that they had a modest home of four rooms and a kitchen and bathroom, which they rent; that there are two bedrooms, one he occupies with his wife and the other is occupied by the petitioner and his wife; that the other rooms are a kitchen and a living-room; that his wife is fairly well, but that she has asthma, and that when she gets those spells she knows fairly well what to do.

On August 14, 1940, further proceedings were had, after a recess of several weeks, and Mrs. Dorothea Kaufmann, the wife of the petitioner, testified that she started to work for the war department on July 25, and she presented a letter to the court from Major Cameron, being introduced as exhibit No. 1, showing that she was employed on a "probational indefinite emergency appointment," from which she was at liberty to resign at any time. She said she took this employment to enable her to pay the lawyer's bill in this case; that she would quit the job tomorrow if the court gave them the child; that her monthly salary is $120 a month. On cross-examination witness testified that she drank beer, but that there was nothing wrong with that. She said that whenever she "happened to want a glass of beer or a bottle" she would get it. She testified that she has not been married before; that she has never had any children of her own; that she has never raised nor reared any children.

The petitioner was recalled as a witness, and testified that his wife was working for the war department in extra work; that she started about two weeks ago; and works from eight in the morning until four in the afternoon, but that this is only temporary work to earn money with which to pay the petitioner's attorney, but insisted that, if the court should give him the possession of the child, his wife would quit working right away.

The petitioner also testified that he filed for his first citizenship papers in 1927 at Plattsmouth, Nebraska, and that about three weeks ago he had filed for his second citizen-

ship papers at the immigration bureau in Omaha. This was under a provision that, where the alien has married a citizen of the United States, the granting of final papers may be expedited.

Henry M. Kaufmann, respondent, testified that he was 29 years of age; that he and his two brothers, Pete and Alois, were all born in Germany; that Pete has been in this country 16 years, and Alois 14 years; that he became a citizen of the United States in 1935, and that Pete had also become a citizen. Henry testified that he was head baker for Louis Somer, having learned the trade in the old country, and has been head of the bakery department for five years, and receives a salary of $160 a month and all of his meals.

He said that they have paid all of the bills for the child, have given it every attention, are perfectly willing to continue to do so, and want to raise him; that they have never made any objection to the petitioner coming to see the child at any time, and if custody is given to them the petitioner and his present wife may see the child at any time. He testified that on the occasion in December, 1938, over at Pete's house, his wife told him, "I am going to take the baby to raise," and the petitioner spoke up and said, "If it is all right with Henry," and "I said, 'Sure it is'" and therefore they took the baby home and kept it. He testified positively that in all the time they had had the baby the father had never offered to pay or contribute anything toward the payment of the expenses of the child.

Mrs. Elvira Kaufmann testified that she was the wife of Pete Kaufmann, a brother of petitioner and Henry; that the petitioner came to her home in December of 1938 with the baby; that she had a child of her own, then about a year and a half old; that petitioner asked her to take charge of the baby, but she said at that time she was not able, and Ella Mae Kaufmann said she would take him, and the petitioner said she could have him "if Henry didn't mind," and she took the child that evening, and has had him ever since. She says she has visited the respondents' home;

that it is an ideal home, clean, sanitary, in a very nice, respectable district, and that the respondents are very solicitous of the welfare of the child, and keep him well dressed and in perfect condition.

Dr. Harry E. McGee testified that he had been in general practice in Omaha since 1919; that he delivered the baby when it was born in October of 1938. The following March he saw it at the home of the respondents. It had a high fever and intestinal flu. He ordered cod liver oil, orange juices, and certain injections. After that it was brought to the office on several occasions. He testified that the last time he saw the child it was well nourished and in good condition, except that it had a small hydrocele. All the bills for medical services were paid by respondent Ella Mae Kaufmann. He testified that the child had been given excellent care by her.

Betty Lainhart testified that she married the petitioner on June 2, 1937, when she was 16 years of age, and was divorced December 8, 1938, when she was 17. She testified that she had never seen her baby from the time of the divorce until about a month ago; that it was very well taken care of, was very well dressed, clean, and was laughing and playing. She testified that she was remarried on July 6, 1940; that they reside at 1710 Chicago street, in a rooming house, and that they have two furnished rooms. She testified that she had filed a petition of intervention so that she could fight for her baby too, but while she was on the witness-stand the court gave her attorney permission to withdraw this petition of intervention.

Ella Mae Kaufmann, one of the respondents, testified that they resided at 6334 Military avenue; that she was 27 years of age; married Henry M. Kaufmann in August of 1937; that they own their own home, and that her husband has been manager of the bake shop at Louis Somer's, Forty-ninth and Dodge streets, for the past ten years; that his salary is $160 a month; that they own an automobile; that they are both members of St. Bernard's church, a Catholic church in Benson; that they attend church every Sunday.

She testified that, at the time the petitioner parted from his first wife, he told her he had no place to take the child, and she agreed that she would take the child and raise it, and has given the child constant custody and care since that date. She testified that the petitioner did not contribute one cent from December 8, 1938, for the purchase of clothing, or food, or doctor bills.

Mrs. Kaufmann testified that the petitioner paid $5 a week for his room, board, and his laundry. She testified that she had had much experience in taking care of children, as she had worked in a good many homes in Omaha, and named Attorney Tunison and D. W. Lyle. She did not do the housework in some homes, but was nursemaid and took care of the children, and continued this work up to the time that she was married. She admitted that she refused to give up the child to the juvenile authorities when the petitioner sent them out to get the child; admits that she has never taken any legal action to adopt the baby. She testified that she had been advised by a medical authority that it was not possible for her to have any children of her own.

Mrs. Kaufmann testified that she had bought baby clothes for him constantly, and the special baby foods which have been necessary; that she loves the child, and they would like to adopt it; that the baby had rickets when she first got him, when the baby was less than three months old, and was in bad condition. She says that her husband treats the baby just as if it was his own child, takes him out for automobile rides, purchases toys, plays with him, and shows affection for him, while the petitioner never took the child out riding, rarely makes any inquiry as to the welfare of the child. Mrs. Kaufmann testified that if she can keep this baby they intend to try and adopt a little girl too. She said she has helped raise many children, in families where she worked as nursemaid, and that she was the oldest of ten children in her own family, and had lots of experience in helping to raise her little brothers and sisters, as she stayed home until she was 19 years old; that they lived on a farm near Wausa, Nebraska.

Rev. J. C. Buckley testified that he had been the pastor of St. Bernard's church, Benson, for 26 years; that the church is located one block from the home of the respondents, who are members and regular attendants of his church. He has often been in the home; it is very neat and clean, and they could not be more attentive to this child if it were their own. He testified that a week before the trial he called on the petitioner at the saloon next to the brewery, and told him that he should be happy in having his child so well taken care of, and, as he had just married another woman, he told him it was a very risky thing to give the care of the child to a complete stranger, and that there was usually very little affection between a stepmother and a stepchild, and told him of the experience with stepmothers in homes, that he had gained in several families. Rev. Buckley testified that the petitioner said: "Father, I am going out to see my brother this evening. I am going to talk this over with him and things will be all right." Rev. Buckley said that he felt very happy and came home. It is disclosed in the evidence that the baby was baptized into the Catholic church in November, 1938. He testified that the child, being a baptized Catholic, has a right to be brought up as a Catholic. The evidence is not clear as to whether the petitioner, or some one else, had the child baptized.

Some five pages of the bill of exceptions are taken up with a demand of the attorney for petitioner that section 29-2802, Comp. St. 1929, be complied with, and that respondents produce the child in court; that the purpose of the habeas corpus action is to have the body of the child in court, and without that it is a nullity. Attorney for respondents insisted there was no question but that the child was in their possession, that the petition so alleged, and the answer admitted it, and no purpose could be accomplished by keeping the baby in the courtroom when it should be taking a nap. The court said if the child was brought into court for even a few seconds, that would comply with the statute, for the child will have been in court. Attorney for petitioner insisted that the child should be in court at

the time the decision was rendered. The court stated that the habeas corpus is practically an action *in rem*, according to the statutes. The petitioner moved the court that, before the case proceed further, the respondents bring the child into court, there to remain pending the judgment of the court. The court overruled petitioner's request, but said to "have the child in here say at 2 o'clock this afternoon." Objection is made that, as the baby is only 21 months old, it cannot be kept in the courtroom, that it should be home asleep in bed.

At 2:20 p. m., June 24, the bill of exceptions shows, the baby was brought into court, and the court said: "Let Mrs. Ella Mae Kaufmann retain custody of the child until the court makes a further order. Now you may take him back and put him to bed. I think that gets our record in shape." The child was also in court when the decision was rendered.

In discussing the law relating to the matters directly at issue, we find that, at an early date, under the English law the father had a predominant right to the guardianship of his child. Even under circumstances of hardship to both the mother and the child, the English courts said the father had a paramount right in such matters, but in this country the father's rights have been qualified and conditioned in the interest of the child's welfare, and if the father has neglected the child, or if there is proof of unfitness of character, or impropriety of life and conduct such as to endanger the child's moral welfare, the guardianship of the child will be given to some other person, and in the latest decisions the welfare of the child is considered to be the controlling question, to which any arbitrary legal right of guardianship must yield, it being the endeavor of the court to promote the child's best interest, pecuniary, social, and moral. 25 Am. Jur. 11, sec. 6.

"In a controversy for the custody and control of a minor child between the grandparents and the father of the child, there is a strong presumption that the interests of the child require that it be confided to the care of its father; but,

when the circumstances and condition of the parties, and their character and purposes in regard to the child, show that it will probably be for its best interest to remain temporarily with its grandparents, who have for some time, with its father's consent, cared for the child and furnished it with a suitable home, the rights of the father must yield to the welfare of the child." *State v. Porter,* 78 Neb. 811, 112 N. W. 286.

"In a controversy for the custody of an infant of tender years the court will consider the best interests of the child and will make such order for its custody as will be for its welfare, without reference to the wishes of the parties." *Schroeder v. State,* 41 Neb. 745, 60 N. W. 89. See, also, *Sturtevant v. State,* 15 Neb. 459, 19 N. W. 617; *Giles v. Giles,* 30 Neb. 624, 46 N. W. 916; *Steward v. Elliott,* 113 Neb. 421, 203 N. W. 580; *Smidt v. Benenga,* 140 Ia. 399, 118 N. W. 439; *Ellison v. Platts,* 226 Ia. 1211, 286 N. W. 413.

Let us consider a case where this court took the child from the respondents and gave it to the mother. It is the habeas corpus case of *State v. Bryant,* 95 Neb. 129, 145 N. W. 266. The mother, being divorced, had secured employment, but had to go to a hospital for an operation, and turned her child permanently over to the respondents. But now, upon her remarriage, she has a good home, attends church and Sunday school, and her present husband is anxious to have the child in his home. The respondents, who have the child, fail to send it to school, to church, or to Sunday school, and take the little child out with them nights when they attend dances, and remain very late. This court said it is quite apparent that it is for the best interest of the child for the mother to have its care and custody.

"One with whom the child has had a home, where it has been properly treated and cared for, should be preferred over one whose appointment would necessitate its removal to a new home. So the separation of children of tender years from one another, or from those to whom they have become attached, should be avoided unless their true inter-

ests peremptorily require it." Woerner, American Law of Guardianship, 98, sec. 32. See, also, Simpson, Law of Infants (4th ed.) 168.

"The welfare of the child is the primary consideration to which all other questions must yield, and the court must consider, not only the spiritual and temporal welfare, but the minor's further training, education, morals, and the ability of the proposed guardian to best take care of the child. *In re Butcher's Estate,* 266 Pa. St. 479." *In re Guardianship of Herten,* 127 Neb. 88, 254 N. W. 698.

The case of *Lemke v. Guthmann,* 105 Neb. 251, 181 N. W. 132, is a habeas corpus proceeding for the possession of a nine-year-old boy. The aunt made a pleasant home for Paul, who called her mother. She could afford to give him luxuries, treated him with affection, and is bringing him up in the church she attends, which is the Catholic. When the aunt took this little boy, at the request of the dying mother, he was but a tiny babe. It is stated that the father, as a matter of law, has a first claim upon the child, but the question is, what is for the best interests of the child? The father is a Lutheran, and ordinarily would have the right to determine the religious instruction to be given the boy. See *Purinton v. Jamrock,* 195 Mass. 187, 80 N. E. 802, 18 L. R. A. n. s. 926. It was held that it is for the best interests of the child to leave him where he is, in the home of the aunt, on condition that the father can control or direct his educational and religious training.

When a somewhat similar case was here, this court said, in referring to the child: "There it is under moral and religious influences softened by liberality and freedom. A court may well hesitate to take a child away from such surroundings to try an experiment elsewhere. It is no disparagement to the stepmother to say that these conditions cannot be equaled in her home. * * * At the trial she made no claim to an affection for the child beyond that imposed by her duties as a stepmother. These facts are not mentioned as reflections upon her fitness to have the custody of the child, but to suggest the difference in conditions to

which a change of custody would subject it." *In re Burdick*, 91 Neb. 639, 136 N. W. 988.

The respondents argue, and we agree, that the child is now, and ever since coming to their home has been, cared for, reared and trained in a most exemplary and devoted manner, and the child will be safe, healthy, moral and happy if his raising and education remain their responsibility.

The father has paid very little, if any, attention to the child, has paid for no clothes, doctor bills, or keep, and has, according to the evidence, avoided all the responsibilities of parenthood. He has purchased just one little toy on one occasion.

Disregarding the wishes of all parties to this litigation, where, from the evidence, does the best chance lie for the proper development, upbringing and education of this child? Does the record justify removing this child from the pleasant home of two manifestly unselfish and loving foster-parents, and from their admittedly good influence and care, and placing him in the strange atmosphere of the proposed home? This court believes that it does not.

Therefore, the judgment of the trial court is reversed, and it is directed that the custody of this child remain with the respondents until further order.

REVERSED.

YEAGER, J., dissenting.

I cannot bring myself to agree with the majority in this case.

I find no serious fault with the legal principles set forth in the opinion, but under the principle that the father has the paramount right to the guardianship of his child, unless the best interests and welfare of the child require some other disposition, I cannot see how, under the record in this case, this court is able to say that the father is not entitled to his child.

It may be conceded that in the past the father never contributed as liberally to the support of the child as he might have, also that his circumstances, so far as finances are

concerned, do not equal those of the respondents, and further that the child has received loving care at the hands of the respondents. It appears that the father works at a place where beer and food are dispensed and that his wife, the stepmother of the child, takes an occasional drink of beer, and that a permanent home arrangement has not as yet been established for the child. The record discloses that the father works steadily, and no immoral practices on his part are shown.

I see nothing in all of this to justify taking from this father his paramount right to the guardianship of his child. Further, the legal effect would be to place the child in the hands of mere volunteers from whom the courts would be without power to exact support for the child if they refused to grant it of their own will.

The natural law, the moral law, the enlightened religious law and the written law recognize the obligation of the parent to support and sustain the child of tender years and the corresponding right to care, custody and control by the parent. Should this sacred relationship be destroyed by a mere difference in economic standing, of difference of opinion on morality or of religion, without a fairly definite showing of unfitness on the part of the parent? My attitude toward the duties, obligations and privileges of parenthood require of me an emphatic negative answer.

The trial judge heard the evidence and observed the witnesses and their demeanor while testifying, and no doubt was in a better position to understand and appraise the true facts than we are. In this view, and in the light of the record presented, I can find no justification for overturning the judgment of the district court.

CARTER, J., concurs in the dissent.